# In the United States Court of Federal Claims

No.  03-2684L & No. 01-568L (consolidated)

(Filed:  December 21, 2010)

| | | |
|---|---|---|
| ************************************** | ) | Indian monetary claims based upon the |
| | ) | Sioux Treaties of August 5, 1851 and June |
| SHELDON PETERS WOLFCHILD, *et al.,* | ) | 19, 1858, the Acts of February 16, 1863, |
| | ) | and March 3, 1863, and the Appropriation |
| Plaintiffs, | ) | Acts for the Department of the Interior in |
| | ) | 1888, 1889, and 1890; subject matter |
| v. | ) | jurisdiction based upon the Indian Tucker |
| | ) | Act, 28 U.S.C. § 1505; amendment of |
| UNITED STATES, | ) | complaints of plaintiffs and intervening |
| | ) | plaintiffs; RCFC 15(a); applicability of |
| Defendant. | ) | Indian Trust Accounting Statute to toll |
| | ) | statute of limitations; partial summary |
| ************************************** | ) | judgment |

Erick G. Kaardal, Mohrman & Kaardal, PA, Minneapolis, MN, for *Wolfchild* plaintiffs. With him on the briefs were William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Jody H. Schwarz, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Sam Costello and Daniel Steele, Trial Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.  Of counsel was James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

John Ernst Jacobson, Jacobson, Buffalo, Magnuson, Anderson & Hogen, P.C., St. Paul, MN, for intervening plaintiff Lower Sioux Indian Community.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the *Cermak* plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris, Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker group of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Michael W. Ellwanger, Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, LLP, Sioux City, IA, for the Enyard and Kitto groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole N. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, *pro se*, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean DuMarce group and the Youngbear group.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD for the Schroder group of intervening plaintiffs.

**OPINION AND ORDER**

LETTOW, Judge.

This case arises under the Indian Tucker Act, 28 U.S.C. § 1505, and comes before the court for proceedings on remand from the Court of Appeals for the Federal Circuit after that court's decision on an interlocutory appeal of questions certified by this court. *See Wolfchild v. United States*, 559 F.3d 1228 (Fed. Cir. 2009) ("*Wolfchild VI*"), *cert. denied*, 130 S.Ct. 2090 (2010). The issues on remand are complex, reflecting both the convoluted and lengthy history of the federal government's relationship with the group of Indians who are plaintiffs and the extensive prior proceedings in this litigation.

**INTRODUCTION**

Plaintiffs are lineal descendants of Mdewakanton Sioux Indians who were loyal to the United States and assisted white settlers in Minnesota during the 1862 Sioux uprising ("the loyal Mdewakanton" or "1886 Mdewakanton"). *See Wolfchild v. United States*, 62 Fed. Cl. 521, 524 (2004) ("*Wolfchild I*"). Approximately 20,750 persons have joined in this litigation as plaintiffs.[1] On October 27, 2004, the court granted partial summary judgment for the plaintiffs, holding that a trust for the benefit of the loyal Mdewakanton and their lineal descendants was created in connection with and as a consequence of appropriations statutes enacted in 1888, 1889, and 1890 ("Appropriation Acts"), providing money to the Department of the Interior ("the Department") for the benefit of the loyal Mdewakanton and their families. *See Wolfchild I*, 62 Fed. Cl. at 555.[2]

The court concluded that the relationship created pursuant to the Appropriations Acts contained the three traditional elements of a trust: a trustee (the United States), specific beneficiaries (the 1886 Mdewakanton and their lineal descendants), and trust property acquired by the Department using the appropriated funds (the 1886 lands, improvements to those lands, and funds derived from those lands). *See Wolfchild I*, 62 Fed. Cl. at 541. The court found additional evidence that a trust was created by looking to the arrangements made by the Department for the use of the 1886 lands by the loyal Mdewakanton and their lineal descendants over the years following acquisition of those lands. *See id.* at 541-43. Ninety years of detailed management of the 1886 lands by the Department, including its assigning rights of use to particular loyal Mdewakanton, monitoring beneficiaries' use of the lands, and leasing non-assigned land to third parties, and the Department's own repeated characterization of the 1886

---

[1]The Wolfchild plaintiffs number about 7,500 persons, and 41 separate groups totaling about 13,250 people were granted leave to intervene as plaintiffs. *See Wolfchild v. United States*, 77 Fed. Cl. 22, 31-35 (2007) ("*Wolfchild IV*").

[2]The three Appropriation Acts are: the Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29, the Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93, and the Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349.

lands as being held "in trust" for the loyal Mdewakanton, further persuaded the court that a trust relationship was created as a consequence of the assignment system.  *See id.*[3]

The court also held that the Act of December 19, 1980, Pub. L. No. 96-557, 94 Stat. 3262 ("1980 Act"), which provided that the government would thereafter hold the 1886 lands in trust for three Indian communities located in Minnesota ("the three communities")[4] did not alter or terminate the trust for the loyal Mdewakanton.  *See Wolfchild I*, 62 Fed. Cl. at 543-44.  Consequently, the court concluded that actions taken in December 1980 and thereafter, including the Department of Interior's disbursement of funds derived from the 1886 lands to the three communities, constituted a breach of that trust.  *See id.* at 555.

Approximately two and one half years after the court's ruling in *Wolfchild I*, the government interposed a motion to certify the court's decisions in *Wolfchild I*, *Wolfchild II*, and *Wolfchild III* for interlocutory appeal under 28 U.S.C. § 1292(d).  *See Wolfchild v. United States*, 78 Fed. Cl. 472 (2007) ("*Wolfchild V*").  The court granted the government's motion in part and certified the following two questions for interlocutory review by the Court of Appeals for the Federal Circuit:

> (1)  Whether a trust was created in connection with and as a consequence of the 1888, 1889, and 1890 Appropriations Acts for the benefit of the loyal Mdewakanton and their lineal descendants, which trust included land, improvements to land, and monies as the corpus; and

> (2)  If the Appropriations Acts created such a trust, whether Congress terminated that trust with enactment of the 1980 Act.

The Court of Appeals granted interlocutory appeal of those two questions and in due course reversed this court's conclusion regarding both certified questions.  *See Wolfchild VI*, 559 F.3d 1228, 1231.  Although the Court of Appeals acknowledged that "Interior Department officials at times characterized the 1886 lands as being held in trust for the 1886 Mdewakantons and their descendants[,]" *id.* at 1241, it decided that "the key question regarding the rights at issue in this case is not whether the 1886 lands were held 'in trust' for the 1886 Mdewakanton descendants to whom they were assigned, but rather what rights were conferred in the assigned lands."  *Id.* at 1248-49.  The Court of Appeals held that that the Appropriations Acts did not create a trust for the benefit of the loyal Mdewakanton nor did they vest any title, legal or otherwise, in that group.  *Id.* at 1240-41, 1249.  Rather, it determined that "the Appropriations

---

[3]The government's motion for reconsideration of the trust holding was denied in *Wolfchild v. United States*, 68 Fed. Cl. 779, 801 (2005) ("*Wolfchild II*").  The court addressed procedural issues in *Wolfchild v. United States*, 72 Fed. Cl. 511 (2006) ("*Wolfchild III*") and also in *Wolfchild IV*.

[4]The three Indian communities are the Lower Sioux Indian Community, the Shakopee Mdewakanton Sioux (Dakota) Community, and the Prairie Island Indian Community in Minnesota.  *See* 94 Stat. 3262.

Acts are best interpreted as merely appropriating funds *subject to a statutory use restriction*." *Id.* at 1240 (emphasis added). Under that view of the Appropriations Acts, the Court of Appeals concluded that the 1886 lands "were being held by the Department of the Interior for use by the 1886 Mdewakantons and their descendants pending an ultimate legislative determination as to how the ownership interests in the lands should be allocated." *Id.* at 1255. Regarding the second certified question, the Court of Appeals found that the 1980 Act furnished that "ultimate legislative determination" by creating a trust for the benefit of the three communities, thereby terminating any trust that would have been created by the Appropriations Acts. *Id.* at 1255, 1259-60. The Court of Appeals remanded the case to this court to address the issue of "whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds." *Id.* at 1259 n.14.

In light of the decision of the Court of Appeals and its remand to this court, plaintiffs and intervening plaintiffs have filed motions to amend their complaints. The government filed a motion to dismiss, arguing that this court lacks subject matter jurisdiction and that the complaint fails to state a claim upon which relief may be granted. Plaintiffs responded with a cross-motion for partial summary judgment respecting their entitlement to the money previously held by Treasury and other monies derived from the 1886 lands.

For the reasons stated below, the government's motion to dismiss is denied, and plaintiffs' and intervening plaintiffs' motions to amend their complaints are granted. Plaintiffs' cross-motion for partial summary judgment is granted in part and denied in part.

## FACTS[5]

### *The Mdewakanton Sioux*

Prior to August 1851, the Minnesota Sioux lived along the Mississippi River, stretching from the Territory of Dakota to the Big Sioux River. *See Medawakanton and Wahpakoota Bands of Sioux Indians v. United States*, 57 Ct. Cl. 357, 359 (1922).[6] Originally, these Sioux were all Mdewakantons, but they later split into four bands, known as the Mdewakanton and the Wahpakoota (together comprising the "lower bands"), and the Sisseton and the Wahpeton (known as the "upper bands" or "Santee Sioux"). *Id.* On September 29, 1837, the Sioux entered

---

[5]Thousands of pages of historical documents have been filed in connection with the pending motions and the prior motions dating back to 2004 in this litigation. The court has drawn upon that historical record in developing the recitation of facts which follows. Unless otherwise noted, the facts set out are undisputed. No authenticity objection has been raised to any of the historical documents. The arguments of the parties focus on the inferences to be drawn from the resulting record.

[6]Some prior documents and decisions refer to the Mdewakanton Sioux as "Medawakanton." The court does not revise or correct the spelling in those instances.

a treaty with the United States by which they ceded "to the United States all their land, east of the Mississippi River, and all their islands in said river[,]" in consideration of the United States' investment of $300,000 for the benefit of the Sioux.  Treaty of Sept. 29, 1837, arts. I-II, 7 Stat. 538 ("1837 Treaty").[7]  Under the treaty, the United States was required to pay an annuity to the Sioux at a rate of not less than five percent interest, such annuity to be paid "forever."  *Id.*, art. II, 7 Stat. at 538.

In 1851, the Mdewakanton and Wahpakoota bands entered another treaty with the United States under which they ceded "all their lands and all their right, title and claim to any lands whatever, in the Territory of Minnesota, or in the State of Iowa[,]" and bound themselves to "perpetual" peace and friendship with the United States.  Treaty of Aug. 5, 1851, arts. I-II, 10 Stat. 954 ("1851 Treaty").  This treaty stated that the government would provide to the bands, among other compensation, a trust fund of $1,160,000, with interest set at five percent, to be paid annually for a period of fifty years.  *See id*, art. IV, ¶ 2, 10 Stat. at 954.  The Sisseton and Wahpeton Bands signed a similar treaty on July 23, 1851, ceding all of their lands in the Territory of Minnesota and the State of Iowa, and "all of the lands owned in common by the four bands by natural boundaries."  *Medawakanton*, 57 Ct. Cl. at 360; Treaty of July 23, 1851, art. II, 10 Stat. 949.  The Sisseton and Wahpeton Bands were to receive compensation comparable to that of the Mdewakanton and Wahpakoota bands, with a trust of $1,360,000 and interest at 5% to be paid out annually for fifty years.  *See* Treaty of July 23, 1851, art. IV, ¶ 2, 10 Stat. at 949.

Article 3 of both 1851 treaties provided for the creation of a reservation for the Minnesota Sioux to run along the Minnesota River.  *See Medawakanton*, 57 Ct. Cl. at 361.  Based upon that Article, the Sioux were removed to the reservation delineated in the treaty.  *See id.* at 360.  The Senate, however, struck out the third article in its ratification of each of the treaties and instead agreed to pay the Sioux for the reservation lands at a rate of 10 cents per acre, the total sum to be added to the trust funds created by the treaties.  *See id.*  The Senate also authorized the President to set aside another reservation outside the limits of the ceded land.  *See id.*  The appropriate compensation corresponding to the ten-cents-per-acre rate was thereafter added to the trust funds created by the treaties, but the President never established an alternative reservation for the Sioux.  *See id.* at 362.  The Sioux continued to live on the land originally intended to serve as their reservation under the 1851 treaties.  *See id.*

In 1858, the United States entered into another treaty with the Sioux under which the Mdewakanton and Wahpakoota bands "agreed to cede that part of their reservation lying on the north side of the Minnesota River" in exchange for compensation, including money and goods, the exact amount of which would be determined by the Senate at a later time.  *Medawakanton*, 57 Ct. Cl. at 365-66; Treaty of June 19, 1858, arts. I-III, 12 Stat. 1031 ("1858 Treaty").[8]  The

_____

[7]Although the 1837 treaty purports to bind the entire Sioux Nation, it appears that the treaty was signed only by leaders of the Mdewakanton band.  *See* 7 Stat. 538.

[8]Specifically, by the 1858 treaty the Mdewakanton and Wahpakoota bands agreed to cede part of their reservation, should the Senate determine they indeed had valid title to that land.  *See* Treaty of June 19, 1858, art. II, 12 Stat. at 1031.  The title was apparently in dispute because at least some portion of the land to be ceded under the 1858 treaty included that land originally

treaty created a new reservation for the Sioux consisting of the land then occupied by the bands along the Minnesota River in south-central Minnesota. *See* 1858 Treaty, art. I, 12 Stat. 1031.[9] By entering the treaty, the Mdewakanton and Wahpakoota bands of the Sioux Indians pledged "to preserve friendly relations with the citizens [of the United States], and to commit no injuries or depredations on their persons or property." *Id.*, art. VI, 12 Stat. at 1031.

### The 1862 Sioux Uprising

In August of 1862, individuals from each of the four bands of the Minnesota Sioux revolted against the United States in response to the United States' failure to furnish the money and supplies promised in exchange for the Sioux lands under the aforementioned treaties. *See* Def.'s Mot. to Dismiss and Mem. in Support ("Def.'s Mot.") at 4.[10] In the course of that uprising, the Sioux killed more than 500 settlers and damaged substantial property, *Wolfchild I*, 62 Fed. Cl. at 526, thereby breaching the 1851 and 1858 treaties. After defeating the Sioux, the United States annulled its treaties with them, which had the effect of, among other things, voiding the annuities that had been granted and were then being paid to the Sioux as part of the terms of the 1837 and 1851 treaties and eliminating any possibility of compensation under the 1858 treaty. *See* Act of Feb. 16, 1863, ch. 37, 12 Stat. 652. A portion of the remaining unexpended annuities was appropriated for payment to those settlers who had suffered damages as a result of the uprising. *Id.*, § 2, 12 Stat. at 652-53. The United States also confiscated the

---

granted to the Sioux by virtue of the 1851 treaty but removed in the Senate ratification process. Congress authorized the President to confirm the land to the Sioux in an 1854 Act, but it maintained that "the President ha[d] not directly confirmed said reserve to said Indians." *Id.*

[9]The Sisseton and Wahpeton bands entered into a similar treaty in 1858 by which they also ceded their land north of the Minnesota River. *See* Treaty of June 19, 1858, 12 Stat. 1037.

[10]A statement made by the Episcopal Bishop of Minnesota and quoted by Senator Fessenden in the course of passing subsequent legislation in 1863 provides a more detailed explanation:

> Four years ago the Sioux sold the Government about eight hundred thousand acres of land, being a part of their reservation. The plea for this sale was the need of more funds to aid them in civilization . . . . Of $93,000 due to the Lower Sioux they have never received a cent.
>
> All has been absorbed in claims except $880.58, which is to their credit on the books in Washington. Of the portion belonging to the Upper Sioux, $88,351.62 was also taken for claims.

CONG. GLOBE, 37TH CONG., 3D SESS. 192 (1863). In short, "[b]y fraud somewhere, these Indians have had money withheld from them which was justly their due." *Id.*

Sioux lands in Minnesota, *Id.*, § 1, 12 Stat. at 652, and later directed that the Sioux be removed to tracts of land outside the limits of the then-existing states. *See* Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819.

Some of the Sioux, however, had been loyal to the United States during the uprising by either not participating in the revolt or affirmatively acting to save the settlers. *See Wolfchild I*, 62 Fed. Cl. at 526. Nonetheless, Congress acted with a broad brush, declaring the Sioux's treaties void and annuities and allocation of land forfeited and failing to except from that termination the loyal Mdewakanton band of Sioux, whose annuity was valued at approximately $1,000,000. *See id.* at 527. Those Sioux who observed their pledge under the 1851 and 1858 treaties to maintain peaceful relations with the citizens of the United States were rendered "poverty-stricken and homeless." *Wolfchild VI*, 559 F.3d at 1232. Many of the loyal Sioux had lost their homes and property but could not "return to their tribe . . . or they would be slaughtered for the part they took in the outbreak." *Wolfchild I*, 62 Fed. Cl. at 526 (quoting CONG. GLOBE, 38TH CONG., 1ST SESS. 3516 (1864)).[11]

*Congress's Initial Efforts to Compensate the Loyal Mdewakanton*

Notwithstanding the broad termination of the Sioux treaties, Congress did attempt to provide for the loyal Mdewakanton by including a specific provision for them in the Act of February 16, 1863. After confiscating the Sioux land, Congress authorized the Department to assign up to eighty acres of that land to each loyal Sioux:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands who exerted himself in rescuing the whites from the late massacre [by] said Indians. The land so set apart . . . shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of Feb. 16, 1863, § 9, 12 Stat. at 654. As the Court of Appeals noted, the provision that the land would be "an inheritance to said Indians and their heirs forever[,]" "clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute." *Wolfchild VI*, 559 F.3d at 1241.

Two weeks after enacting this statute Congress passed an additional act providing for the loyal Sioux. *See* Act of Mar. 3, 1863, ch. 119, 12 Stat. 819. The second Act of 1863

---

[11]By an 1868 treaty with the Sioux, the United States resumed paying annuities and providing goods and land to the Sioux. *See* Treaty of Apr. 29, 1868, 15 Stat. 635. The loyal Mdewakanton, however, did not benefit under this treaty as they had severed all tribal relations, and were no longer considered "Sioux." *See* 21 CONG. REC. 7,585, 7,587 (1890) (statement of Sen. Dawes) ("The Sioux fund and the Sioux appropriation grow out of an arrangement made in 1868, not with these Sioux [the loyal Mdewakanton], but with the warlike Sioux, from whom this band separated themselves and whom the warlike Sioux never afterward recognized.").

supplemented the first Act of 1863 in important respects.  Under the second Act, the President was "authorized" and "directed" to set apart "outside of the limits of any state" eighty acres of "good agricultural lands" for the Sioux.  *Id.*, § 1, 12 Stat. at 819.[12]  This grant of land appeared to be an attempt to address the fact that the first Act of 1863 confiscated all Sioux land, leaving the Sioux with no direction as to where they might make a new home.  *See* CONG. GLOBE, 37TH CONG., 3D SESS. 528 (1863) (statement of Sen. Harlan) ("It was supposed by the committee that this removal of the Indians could not take place immediately . . . [and] that a place must first be looked up for the Indians.").  The second Act of 1863 also stated:

> [I]t shall be lawful for [the Secretary of Interior] to locate any [loyal Sioux] . . . upon said [reservation] lands on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law: *And provided, further*, That no more than eighty acres shall be awarded to any one Indian, under this or any other act.

Act of Mar. 3, 1863, § 4, 12 Stat. at 819.

The Court of Appeals concluded that the second Act of 1863 "superseded" the first Act of 1863, and "pointedly left open the nature of the interest that the assignees would have in the lands, stating that the lands would be 'held by such tenure as is or may be provided by law.'" *Wolfchild VI*, 559 F.3d at 1241-42.  Because the Court of Appeals found that the second Act superseded the first Act of 1863, it concluded that "the failure of the 1863 Acts cannot be viewed as leading Congress to create permanent ownership interests in the 1886 lands along the same lines set forth in the first 1863 statute, because the second of the two 1863 Acts left the question of ownership open to later resolution."  *Id.* at 1242.

The Federal Circuit's view of the relationship between the two Acts of 1863, however, misreads the second enactment.  The original version of the bill that became the second Act of 1863 provided that the Secretary could assign one hundred and sixty acres to each loyal Sioux. *See* CONG. GLOBE, 37TH CONG., 3D SESS. 528 (1863).  In the course of debating the bill, Senator Fessenden suggested that "the one hundred and sixty acres ought to be reduced to eighty, and there ought to be a reference to the former act to provide that but eighty shall be given under any act; otherwise it might be construed to give him eighty acres under that act and eighty under this."  *Id.*  The Senate concurred, and the provision that "no more than eighty acres shall be awarded to any one Indian, under this or any other act" was added.  *Id.*

This history demonstrates that Congress was not "superseding" the first Act of 1863 by the second Act of 1863; to the contrary, it passed the second act with the specific understanding that the first Act of 1863 remained valid.  The amendment to the second act to include a

---

[12]The Act also provided that the land that previously served as the reservation for the Sioux would be sold to "actual bona fide settler[s]" or "sold at public auction[,]" Act of Mar. 3, 1863, § 3, 12 Stat. at 819, and that proceeds from the sale of the lands that previously served as the Sioux's reservations were to be "invested by the Secretary of the Interior for the benefit of said Indians in their new homes, in the establishing [of] them in agricultural pursuits."  *Id.*, § 4, 12 Stat. at 819.

reference to "any other act" shows that the two acts of 1863 were intended to co-exist, with the Secretary of the Interior ("the Secretary") entitled to provide relief to the loyal Sioux under either act.[13]  Where, as here, the legislature supplements or amends an act so as to specify that a beneficiary of the subsequent act may not receive relief under *both* the prior and subsequent act, there is certainly no conflict between the two statutes, and an implied repeal of the prior act cannot be inferred.  *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007) ("We will not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary . . . in order that the words of the later statute shall have any meaning at all." (citation and internal quotations omitted)); *Miccosukee Tribe of Indians of Fla. v. United States Army Corps of Eng'rs*, 619 F.3d 1289, 1299 (11th Cir. 2010) ("Congress's intent to effect an implied repeal can be inferred when a later statute conflicts with or is repugnant to an earlier statute; or when a newer statute covers the whole subject of the earlier one, and clearly is intended as a substitute[,] . . . [but] a conflict [between the two statutes] is a minimum requirement.") (citations omitted); *Cathedral Candle Co. v. United States Int'l Trade Comm'n*, 400 F.3d 1352, 1365 (Fed. Cir. 2005) ("The Supreme Court has frequently explained that repeals by implication are not favored, and it has instructed that 'where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to be contrary, to regard each as effective.'") (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S 986, 1018 (1984)).

The land-grant provisions of both 1863 Acts intended to benefit the loyal Sioux were not successfully implemented.  *See Wolfchild I*, 62 Fed. Cl. at 526-27.  The Secretary did not exercise the authority granted by either 1863 Act, and no lands were provided to the loyal Mdewakanton.  *Wolfchild VI*, 559 F.3d at 1232.[14]  Notably, however, neither act has been repealed.

Two years later, in 1865, Congress attempted once again to alleviate the continuing plight of the loyal Sioux by appropriating an additional $7,500 for their benefit.  *See* Act of Feb. 9, 1865, ch. 29, 13 Stat. 427.  In doing so, Congress acknowledged that the loyal Sioux, who "at the risk of their lives, aid[ed] in saving many white men, women, and children from being massacred," had as a result been forced to sever their relationships with the tribe and "were compelled to abandon their homes and property, and are now entirely destitute of means of support."  *Id.*

Thereafter, additional efforts were made to address the failure to implement the 1863 Acts.  Beginning in 1884, Congress began appropriating funds for the benefit of the

---

[13]This relationship between the two Acts of 1863 accords with the fact that the first Act of 1863 allowed the Secretary to set apart unspecified public lands not otherwise appropriated, Act of Feb. 16, 1863, § 9, 12 Stat. at 654, while the second Act of 1863 provided that the Secretary could assign to the loyal Sioux lands that had previously served as reservation lands for the Sioux.  Act of Mar. 3, 1863, § 4, 12 Stat. 819.

[14]The failure to purchase land for the loyal Sioux was apparently due to fervent opposition by whites to permitting any Sioux from resettling in the state.  *See Wolfchild VI*, 559 F.3d at 1232-33.

Mdewakantons who had remained in Minnesota or had returned to the state. *See* Act of July 4, 1884, ch. 180, 23 Stat. 76, 87 (appropriating $10,000 for the purchase of stock and "other articles necessary for their civilization and education, and to enable them to become self-supporting"); Act of Mar. 3, 1885, ch. 341, 23 Stat. 362, 375 (amending the 1884 Act by allowing the Secretary to disburse funds to the full-blooded Mdewakanton "for agricultural implements, lands, or cash, as in his judgment may seem best for said Indians"); Act of May 15, 1886, ch. 333, 24 Stat. 29, 39-40 (appropriating $10,000 for the purchase of "such agricultural implements, cattle, lands, and in making improvements thereon, as in [the Secretary's] judgment may seem best for said Indians"). Pursuant to the 1884, 1885, and 1886 statutes, Interior Department officials purchased land for the Mdewakanton and distributed it to many of them in fee simple. *See Wolfchild VI*, 559 F.3d at 1233. This method of providing land to the Mdewakanton failed to supply long-term relief to the group as most of the recipients sold the land, otherwise encumbered it, or abandoned it. *Id.* Consequently, "the Interior Department discontinued the practice of transferring land to the loyal Mdewakantons in fee." *Id.*

*The 1886 Census and the 1888, 1889, and 1890 Appropriations Acts*

In 1886, the Department of Interior set out to establish with a greater degree of certainty which Mdewakanton were loyal to the United States during the 1862 uprising. Because of the administrative difficulty of this task, Congress decided that presence in Minnesota as of May 20, 1886 would suffice to qualify an individual as a "loyal Mdewakanton." *Wolfchild I*, 62 Fed. Cl. at 527. To determine which Mdewakanton lived in Minnesota on May 20, 1886, U.S. Special Agent Walter McLeod took a census listing all of the full-blood Mdewakantons, which census was mailed to the Commissioner of Indian Affairs on September 2, 1886. *Id.* at 528.[15] At the behest of the Secretary, on January 2, 1889, a second supplemental census was taken by Robert B. Henton, Special Agent for the Bureau of Indian Affairs ("BIA"), of those Mdewakanton living in Minnesota since May 20, 1886. *Id.* The McLeod and Henton listings (together, "the 1886 census") were used to determine who would receive the benefits of the later Appropriations Acts. *Id.*

Motivated by the failure of the 1863 Acts to provide viable long-term relief, in 1888, 1889, and 1890, Congress passed three Appropriations Acts that included provisions for the benefit of the loyal Mdewakanton. *See Wolfchild VI*, 559 F.3d at 1241; *Wolfchild I*, 62 Fed. Cl. at 524.[16] These Acts served as the foundation of the plaintiffs' breach-of-trust claims asserted in this litigation, and led to the approximately $60,000 in land proceeds that are at issue on remand. That $60,000, identified in a report prepared in 1975, had grown to $131,483 by 1980, and, with

---

[15]Although the census was not prepared as of May 20, 1886, "inclusion on the McLeod list has been deemed to create a rebuttable presumption that an individual met the requirements of the subsequent 1888, 1889, and 1890 Acts." *Wolfchild I*, 62 Fed. Cl. at 528.

[16]Notably, over thirty years later, the funds provided under the Appropriations Acts were deducted from a judgment for the Mdewakanton and Wahpakoota Bands, which judgment was rendered to compensate them for the annuities that were terminated by the 1863 Acts. *See Wolfchild VI*, 559 F.3d at 1254 (citing *Medawakanton*, 57 Ct. Cl. 357).

additional interest since 1980, would be a few times greater than that larger amount by today, thirty years later.

In 1888, Congress appropriated $20,000 "to be expended by the Secretary of the Interior" in purchasing land, cattle, horses, and agricultural implements for those "full-blood" loyal Mdewakanton who had severed their tribal relations.  Act of June 29, 1888, ch. 503, 25 Stat. 217, 228-29.[17]  In 1889, Congress appropriated a further sum of $12,000 "to be expended by the Secretary of the Interior" for the "full-blood" loyal Mdewakanton.  Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992-93.[18]  The 1889 Act was substantially similar to the 1888 Act but included

---

[17]The section of the statute pertaining to the loyal Mdewakanton provided as follows:

> For the support of the full-blood Indians in Minnesota, belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations, twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses and lands: *Provided,* That of this amount the Secretary if he may deem it for the best interests of said Indians, may cause to be erected for the use of the said Indians at the most suitable location, a school house, at a cost not exceeding one thousand dollars: *And provided also,* That he may appoint a suitable person to make the above-mentioned expenditures under his direction, the expense of the same to be paid out of this appropriation.

25 Stat. at 228-29.

[18]The relevant portion of the 1889 appropriation act reads as follows:

> For the support of the full-blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, twelve thousand dollars, to be expended by the Secretary of the Interior as follows: Ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each of these Indians or family thereof; one thousand dollars, or so much thereof as may be necessary to defray the expenses of expending the money in this paragraph appropriated; and one thousand dollars for the completion and furnishing of the schoolhouse for said Indians authorized by the act of June twenty-ninth, eighteen hundred and eighty-eight: *Provided,* That if the amount in this paragraph appropriated, or any portion of the sum appropriated for the benefit of these same Indians by said act of June twenty-ninth, eighteen hundred and eighty-eight, shall not be expended

three additional provisions not included in the 1888 Act.  Unlike the 1888 Act, the 1889 Act required the Secretary to expend the appropriated funds in a manner such that each loyal Mdewakanton received as close to an equal amount as practicable.  *Id.*  Additionally, the 1889 Act mandated that any money appropriated in the 1889 Act not expended within the fiscal year would not be recovered by Treasury, but rather would be carried over to the following years and expended for the benefit of the loyal Mdewakanton.  *Id.* at 992.  The 1889 Act made both of these additional provisions applicable to the money appropriated under the 1888 Act as well.  *Id.* at 992-93.  The 1889 Act differed from the 1888 Act in a third way by granting the Secretary discretion based on what "may be deemed best in the case of each of these Indians *or family thereof*."  *Id.* at 992 (emphasis added).  The 1888 Act, on the other hand, made no explicit mention of the loyal Mdewakantons' families as beneficiaries of the appropriations.  *See* 25 Stat. at 228-29.

In 1890, Congress provided an additional $8,000 "to be expended by the Secretary of the Interior" for the loyal Mdewakanton.  Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349.[19]  The

---

> within the fiscal year for which either sum was appropriated, neither shall be covered into the Treasury, but shall, notwithstanding, be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians: *And provided also*, That the Secretary of the Interior may appoint a suitable person to make the above-mentioned expenditure under his direction; and all of said money which is to be expended for lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable an equal amount in value of this appropriation and that made by said act of June twenty-ninth, eighteen hundred and eighty-eight: *And provided further*, That as far as practicable lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality against his will.

25 Stat. at 992-93.

[19]The full text of the 1890 appropriation provided as follows:

> For the support of the full and mixed blood Indians in Minnesota heretofore belonging to the Mdewakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations, eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, good, or clothing as may be deemed best in the case of each of these Indians or families thereof: *Provided,* That two thousand dollars of the above eight thousand dollars shall be expended for the Prairie Island settlement of Indians in Goodhue County: *Provided further,*That the Secretary of the Interior may

1890 Act was substantially similar to the 1889 Act, and included the requirement that the Secretary spend the money in a way that ensured each loyal Mdewakanton would receive as close to an equal amount as practicable. *Id.* There were, however, two unique aspects of the 1890 Act. First, the 1890 Act dictated that the amount was to support both "full and mixed blood" loyal Mdewakanton. *Id.* Additionally, the 1890 Act did not include the provision found in the 1889 Act specifying that any monies not expended in the fiscal year were to be carried over to the following years. *See id.*[20]

### *Land Assignments under the Appropriations Acts*

Unlike the failed 1863 Acts, the funds provided by the three Appropriations Acts were used for the purchase of land, agricultural implements, livestock, and goods for the loyal Mdewakanton. *See Wolfchild I*, 62 Fed. Cl. at 528. The lands were purchased in three distinct areas of Minnesota, and by 1980 they consisted of: (1) approximately 260 acres in Scott County (the "Shakopee lands"), (2) approximately 575 acres in Redwood County (the "Lower Sioux" lands), and (3) approximately 120 acres in Goodhue County (the "Prairie Island" lands). *Id.* Collectively, these properties were known as the "1886 lands" to reflect the date by which the beneficiaries of the Appropriations Acts were defined. *Id.*

In 1904, the Secretary began conveying rights to use the purchased land to the loyal Mdewakanton. *See* Def.'s Mot. at 4. Rather than granting the land in fee simple—a practice that had failed to provide long-term relief under the 1884, 1885, and 1886 appropriations—the Department chose to make the land available to the loyal Mdewakanton while retaining title in the United States' name. *See Wolfchild I*, 62 Fed. Cl. at 528; *see also* Pls.' App. in Support of Cross-Mot. for Summ. Judgment ("Pls.' App.") at 61 (Letter from Acting Comm'r of Dep't of Interior to James McLaughlin, U.S. Indian Inspector) (Feb. 20, 1899)) ("As you are doubtless

---

appoint a suitable person to make the above-mentioned expenditure under his direction whose compensation shall not exceed one thousand dollars; and all of said money which is to be expended for[t] lands, cattle, horses, implements, seeds, food, or clothing shall be so expended that each of the Indians in this paragraph mentioned shall receive, as nearly as practicable, an equal amount in value of the appropriation: *And provided further,* That, as far as practicable, lands for said Indians shall be purchased in such locality as each Indian desires, and none of said Indians shall be required to remove from where he now resides and to any locality or land against his will.

26 Stat. at 349.

[20]This provision was contained in the original version of the bill but was elided pursuant to an amendment proposed by Senator Cockrell who declared it a "remarkable provision." 21 CONG. REC. 7,586 (1890). Senator Dawes responded to Senator Cockrell by observing that "[t]his whole paragraph [the entire text of the 1890 appropriation to the loyal Mdewakanton] is [not] of the ordinary course of an Indian appropriation bill." *Id.* Senator Cockrell responded: "Or any other appropriation bill, is it not?" *Id.*

aware, the title to all the land purchased by late Agent Henton for said Indians [loyal Mdewakanton], is still vested in the United States — being held in trust for them."). To that end, the Department employed an assignment system under which a parcel of land would be assigned to a particular beneficiary who could use and occupy the land as long as he or she wanted; however, if the assignee did not use it for two years, the parcel would be reassigned.  *See Wolfchild I*, 62 Fed. Cl. at 528.

Under the assignment system, the Department provided documents called Indian Land Certificates to assignees as evidence of their entitlement to the land.  *See Wolfchild I*, 62 Fed. Cl. at 528.  The Certificates stated that the assignee "and [his] heirs are entitled to immediate possession of said land, which is to be held in trust, by the Secretary of the Interior, for the exclusive use and benefit of the said Indian, so long as said allottee or his or her heirs occupy and use said lands."  Def.'s Mot., Ex. P (Indian Land Certificate).[21]  If an assignee abandoned the land for a period of time, usually two years, then the Department of Interior would reassign the land to another beneficiary; any sale, transfer, or encumbrance of the land other than to the United States was void.  *Wolfchild I*, 62 Fed. Cl. at 529.  "Although not guaranteed under the assignment system, in practice an assignee's land would pass directly to his children upon his death."  *Id.*  Other relatives, however, were required to follow procedures established by the Bureau of Indian Affairs to receive an assignment.  *Id.*

*Evolution of the Three Communities*

In 1934, the Indian Reorganization Act ("Reorganization Act") fundamentally altered the way in which the federal government dealt with Indians and Indian tribes.  *See* Act of June 18, 1934, ch. 576, 48 Stat. 984 (also known as the Wheeler-Howard Act) (codified as amended at 25 U.S.C. §§ 461-79).  The Reorganization Act permitted "[a]ny Indian tribe, or tribes, residing on the same reservation . . . to organize for its common welfare."  *Id.*, § 16, 48 Stat. at 987.  Pursuant to the Act, the Mdewakanton and others formed three communities: the Shakopee Mdewakanton Sioux Community, the Prairie Island Indian Community, and the Lower Sioux Indian Community.  *See Wolfchild I*, 62 Fed. Cl. at 529.  Although loyal Mdewakanton resided in the three communities, the three communities were and are not exclusively comprised of descendants of the loyal Mdewakanton, and "many of the descendants of the 1886 Mdewakantons are not enrolled members of any of the three communities."  *Wolfchild VI*, 559 F.3d at 1235.  The membership of these communities thus is not defined in terms of indigenous

---

[21]In accord with the representation in the Indian Land Certificates that the land was "held in trust . . . by the Secretary of the Interior" for the assignee and his heirs, Congress amended a bill that allowed the Secretary of Interior to sell an unfarmable parcel of 1886 lands to include a requirement that the loyal Mdewakanton had to consent to the sale.  *See Wolfchild I*, 62 Fed. Cl. at 528-29; Act of Feb. 25, 1901, ch. 474, 31 Stat. 805, 806.  In the course of debating that amendment, Senator Pettigrew remarked that "[the 1886 lands] were not an Indian reservation. These Indians own the homes, and they have a right there greater than that of reservation Indians. The land was purchased for their benefit, and the title is in them subject to a provision by which they can not convey it."  *Wolfchild I*, 62 Fed. Cl. at 529 (citing 34 CONG. REC. 2,523 (1901)).

relationships;[22] rather, the communities exercise discretion over who attains or keeps their membership. *See Wolfchild I*, 62 Fed. Cl. at 530; *see, e.g.,* Def.'s Mot., Ex. E, art. III (Constitution and Bylaws of the Lower Sioux Indian Community in Minnesota). As a result, "a lineal descendant of a loyal Mdewakanton might be denied admission to, or removed from, membership in a community even if the descendant lived on 1886 land encompassed by the community boundary." *Wolfchild I*, 62 Fed. Cl. at 530.

As a consequence of the fact that the communities were not equivalent to the loyal Mdewakanton, the communities did not have a collective claim to the 1886 lands. In 1978, a Field Solicitor for the Department of Interior addressed this issue: "[N]one of the three Community governments, organized under the [Reorganization Act] . . . has any right, title or interest in these lands. The land is held for the benefit of a specific class of people and their descendants." Joint App. ("J.A.") 00399-400 (Letter from Mariana R. Shulstad, Field Solicitor, to Edwin L. Demery, Area Dir. for Minneapolis Area Office of the Bureau of Indian Affairs (Nov. 8. 1978) ("Shulstad 1978 Letter")).

Nonetheless, after the passage of the Reorganization Act, the BIA consulted with the communities before granting assignments to 1886 lands. *See Wolfchild I*, 62 Fed. Cl. at 529-30. Although the Field Solicitor for the Department noted that the communities' recommendations were "a courtesy only" and not "a legal necessity, since the communities have no decision making authority concerning use of these lands[,]" the communities were provided an opportunity to influence the assignment of 1886 lands. J.A. 00400 (Shulstad 1978 Letter). Additionally, prior to the establishment of the three communities, the Department's policy was that any sand and gravel deposits located on the 1886 lands were the government's property and were not subject to sale by the assignees. *See* Def.'s Mot., Ex. D (Letter from J.W. Balmer, Superintendent of the Pipestone Indian School to Earl Pendleton) (Nov. 22, 1930)). After the passage of the Reorganization Act, however, the BIA adopted the view of the Lower Sioux Indian Community that sand and gravel on the 1886 lands within the reservation constituted a community resource and was not the government's property. *See* Def.'s Mot. at 8.

### *Funds Derived from the 1886 Lands*

Eventually, money derived from 1886 lands began to be held in Treasury accounts. On June 13, 1944, Congress enacted a statue authorizing the Secretary to transfer approximately 110.24 acres of 1886 lands in Wabasha County to the Upper Mississippi River Wild Life and Fish Refuge ("the Wabasha Land Transfer"). *See* An Act to Add Certain Lands to the Upper Mississippi Wild Life and Fish Refuge, Pub. L. No. 78-335, ch. 243, 58 Stat. 274. The parcels had been acquired pursuant to the 1888 and 1889 Appropriations Acts "for Indian use, but [were] no longer [being] used by Indians." *Id.*, § 2, 58 Stat. at 274.

---

[22]Groups organized pursuant to and recognized by the Reorganization Act are not required to "correspond exactly to any tribe or band." FELIX COHEN, ON THE DRAFTING OF TRIBAL CONSTITUTIONS 5 (David E. Wilkins ed., Univ. of Oklahoma Press 2006) (1934). Accordingly, "[a]ll the Indians of a given reservation may organize as a unit if they so desire, regardless of past tribal affiliations." *Id.*

The Secretary of the Interior drafted a bill to authorize the land transfer and proposed it to Congress.  *See* S. Rep. No. 78-809, at 1 (1944).  In his proposal, the Secretary noted that "[t]hese lands cannot be acquired or transferred in the usual manner as their use has been fixed by Congress. . . [i]n these circumstances it is recommended that the proposed legislation be placed before the Senate for appropriate action."  *Id.* at 2.  In the course of considering the Secretary's bill, Senator Mundt remarked, "I understand that it is a matter of transferring the title so that it can be used by the refuge."  90 CONG. REC. 5,325 (1944).  The Act provided as follows:

> In order to carry out . . . [the transfer of the land], the sum of $1,261.20 . . . is hereby made available for transfer on the books of the Treasury of the United States to the credit of the Mdewakanton and Wahpakoota Bands of Sioux Indians pursuant to the provisions of the Act of May 17, 1926 (44 Stat. 560) . . . and shall be subject to disbursement under the direction of the Secretary of the Interior for the benefit of the Mdewakanton and Wahpakoota Bands of Sioux Indians.  Where groups of such Indians are organized as tribes under the [Reorganization Act], the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of Indians so organized.

Pub. L. No. 78-335, § 2, 58 Stat. 274.[23]  The 1886 lands at Wabasha were transferred, and on October 6, 1944, $1,261.20 was credited to the United States Treasury Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota Bands of Sioux Indians, Minnesota."  *See* Def.'s Mot. at 8, Ex. A (Letter from F.G. Hutchinson, Acting Chief, Branch of Realty, to E.M. Pryse, Area Director, Minneapolis, Minn. (Feb. 24, 1955)), Ex. B (Letter from C.B. Emery, Chief, Branch of Budget and Finance, to D.C. Foster, Area Director, Minneapolis, Minn. (June 8, 1951)).

Although the 1944 Act provided the funds to the Mdewakanton and Wahpakoota generally, not the loyal Mdewakanton specifically, the Act notably allowed funds from the Wabasha Land Transfer to be disbursed to tribes organized under the Reorganization Act only in proportion to the number of Mdewakanton and Wahpakoota contained within those tribes.  *See* Pub. L. No. 78-335, § 2, 58 Stat. 274.  The importance of the restriction contained in the last sentence was reiterated by the Chief of Budget and Finance for BIA, C.B. Emery, in a letter dated June 8, 1951, to the Area Director of BIA for Minneapolis, D.C. Foster, in response to Mr. Foster's inquiry as to the status of the Wabasha Land Transfer funds.  *See* Def.'s Mot., Ex. B (In regards to the Wabasha Land Transfer funds, "[t]he last sentence of the Act of June 13, 1944 should be particularly noted.").[24]

---

[23]The Act also provided that the $1,261.20 "when so transferred, shall operate as a full, complete, and perfect extinguishment of all their right, title, and interest in and to the lands above described."  Pub. L. No. 78-335, § 2, 58 Stat. 274.

[24]The 1944 Act also made the Wabasha Land Transfer funds subject to the restrictions contained in the Act of May 17, 1926, ch. 309, 44 Stat. 560.  *See* Pub. L. No. 78-335, § 2, 58 Stat. 274.  The effect of that statute is discussed *infra*, at 34 n.42.

Money was also derived from the 1886 lands by the Department's policy of leasing or licensing 1886 lands for fair market value where no eligible 1886 Mdewakanton was available for the land assignment. *See Wolfchild I*, 62 Fed. Cl. at 530. The Department sometimes licensed the unused parcels to non-Indians for a fixed compensation to be paid to a third party. *See, e.g.*, Def.'s Mot., Ex. R (License Agreement (Apr. 22, 1916)) (granting license to non-Indian in consideration of $25.00 per annum payment to Pipestone Indian School, Pipestone, Minn.). The Department also deposited some leasing funds derived from the 1886 lands in various Treasury accounts. *See* Def.'s Mot., Ex. C (Accountant's Report, Income to Mdewakanton Sioux Lands, Minneapolis Area Office, Minneapolis Minn. (Field work for report completed Feb. 5, 1975)) ("1975 Report").

In 1974, the Acting Associate Solicitor for Indian Affairs in the Department, Duard R. Barnes, wrote a detailed opinion explaining the Department's interpretation of the status of the 1886 lands and the funds derived from the land. J.A. 00392-97 (Mem. to Comm'r of Indian Affairs (Mar. 19, 1974)) ("Barnes 1974 Mem."). The opinion stated that legal title was taken in the United States' name, and tenancies at will or defeasible tenancies were granted to the 1886 Mdewakantons. J.A. 00394. The memorandum concluded that the 1886 lands were "held in trust by the United States with the Secretary possessing a special power of appointment among members of a definite class." *Id.* at 00396. The opinion also noted that whereas lease income from the 1886 lands had been "expended through local tribal governments . . . for the benefit of reservation communities in which members of the beneficiary class reside or with which they are affiliated[,]" in the future "[p]roceeds from the leases should be kept separate and may be expended for the benefit of the class." *Id.* at 00394, 00397. The letter ended by proposing that the BIA "undertake to ascertain whether some legislative disposition of beneficial title to these lands consistent with the present situation is current and can be recommended to the Congress." *Id.* at 00397. Pursuant to the 1974 opinion letter, the BIA began to deposit lease income in suspense accounts, *see* Def.'s Mot., Ex. C, and ordered that all income from the 1886 lands be identified and maintained in a separate account. *Id.*, Ex. F (Mem. from Milton C. Boyd, Chief, Office of Audit, BIA, to Minneapolis Area Director (Mar. 21, 1975)).

In 1975, the BIA completed a report documenting all funds derived from the 1886 lands. *See* Def.'s Mot., Ex. C. The 1975 Report found no evidence of any income derived from the 1886 lands prior to 1950 with the exception of the Wabasha Land Transfer. *Id.*[25] The BIA accountants found a total of $61,725.22 in funds derived from the 1886 lands, including the $1,261.20 in Wabasha-Land-Transfer funds. The Accounts were divided into three "Proceeds of Labor" Treasury accounts,[26] and four Individual Indian Money ("IIM") accounts. *Id.*[27] Of the

---

[25]The 1975 Report did not provide an accounting of any income disbursed to the assignees or to the Pipestone Indian School.

[26]The "Proceeds of Labor" Treasury Accounts were: Account 147158, "Proceeds of Labor, Lower Sioux Indian Community," Account 147043, "Proceeds of Labor, Prairie Island Indian Community," and Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota." *See id.*

remaining $60,464.02, $58,784.96 was deposited in four Lower Sioux Treasury and IIM accounts, and $1,679.06 was deposited in two Prairie Island Treasury and IIM accounts.  *Id.*  As is evident from the accounting described above, the majority of the income derived from the 1886 lands was allocated to accounts belonging to the Lower Sioux, and no money accounted for in the 1975 Report was attributed to the Shakopee Mdewakanton Sioux.  *See id.*  The entire $61,725.22 was subsequently placed in Treasury Account 147436 "Proceeds of Labor, Mdewakanton and Wahpakoota" and its associated interest account, 147936, thus, in the words of the BIA, "restor[ing] these funds to the proper accounts."  *See id.*

On June 27, 1975, BIA officials met with representatives of the three communities to address the disbursement of the money gathered in Treasury Account 147436 and its associated interest account.  *See* Def.'s Mot. at 10.  The parties agreed that the three communities "would submit resolutions requesting distribution of the . . . funds" and "requesting a Congressional directive as to the 1886 lands."  *Id.*  The three communities submitted their proposals to the BIA, *see id.*, and by September 1980, the three communities had agreed that the funds should be divided equally and disbursed to the communities, and that any money earned after January 1, 1978 would be paid to the community whose reservation encompassed the 1886 lands from which the funds were derived.  *See id.*, Ex. I (Mem. to Area Director of Minneapolis Area Office from Richard L. McLaughlin, BIA (Sept. 16, 1980)).

About the same time that some BIA officials were consulting the three communities as to the funds derived from the 1886 lands, other BIA officials realized that the three communities did not have a claim to the funds.  In a response dated Nov. 6, 1975 to an inquiry by Minnesota Representative Richard Nolan regarding the 1886 lands and funds derived from the lands, the Acting Area Director for the Minnesota Field Office of the BIA stated that "the funds appropriated are to be used only for the benefit of a certain class of people identified by special census of that time [the 1886 Mdewakanton] [and] [t]he current Sioux Communities do not represent the special class of people referred to even though some of their members may qualify in the special class mentioned in the actions taken in 1888, 1889, and 1890."  J.A. 02548 ("Area Director's 1975 Mem.").  In a subsequent memorandum dated June 3, 1976, to the Commissioner of Indian Affairs, the Office of the Area Director reiterated that the funds obtained by virtue of the 1886 lands could not be distributed to the three communities without legislative action.  He stated,

> [W]e should not attempt to distribute such funds on the strength of the resolutions from the three communities at this time . . . The land was originally purchased for the Mdewakanton Sioux residing in Minnesota on May 20, 1886, and their descendants . . . A very small portion of the descendants reside on the three Minnesota Sioux Communities today.   A question arises as to whether all

---

[27]An IMM account is "an interest bearing account for trust funds held by the Secretary that belong to a person who has an interest in trust assets.  These accounts are under the control and management of the Secretary.  There are three types of IMM accounts: unrestricted, restricted, and estate accounts."  25 C.F.R. § 115.002.  The Report does not specify in which types of IIM accounts the funds were placed.  *See* Def.'s Mot., Ex. C.

descendants would be entitled to the income similar to an Indian Claims
Commission judgment award distributed to descendants. . . .

One suggestion to resolve this matter would be to incorporate the disposition of
the funds with legislation converting the title.  Another suggestion would be to
develop a descendancy roll similar to a claim distribution, however, this would
only dispose of funds accumulating up to the date of the payment and would have
to be repeated in the future, or until title to the land is changed.  We would
appreciate your advice and authority for the disposition of subject funds.

J.A. 01115-16 ("Area Director's 1976 Mem.").

Nonetheless, on January 9, 1981, the BIA disbursed $37,835.88 to the Shakopee
Mdewakanton, $36,210.01 coming from Treasury Account 147436 and $1,625.87 coming from
the associated interest account 147936.  *See* Def.'s Mot., Ex. K (Public Voucher (Dec. 30,
1980)).  On March 3, 1981, the BIA disbursed $37,835.88 to the Lower Sioux, $27,601.78
coming from Treasury Account 147436 and $10,234.10 coming from a Lower Sioux "Proceeds
of Labor" and interest account.  *See id.*, Ex. L (Public Voucher (Feb. 23, 1981)).  And on April
21, 1981, the BIA disbursed the final $37,835.88 to the Prairie Island community, $25,450.48
coming from accounts 147436 and 147936 and $12,385.40 from a Prairie Island "Proceeds of
Labor" and interest account.  *See id.*, Ex. M (Public Voucher (Apr. 21, 1981)).[28]  The BIA made
additional disbursements from Treasury Account 147436 in 1981 and 1982, with the Shakopee
Mdewakanton receiving $6,429.71, the Lower Sioux receiving $5,115.85, and the Prairie Island
receiving $6,429.71.  *See* Def.'s Mot. at 11; *id.*, Ex. N (Public Voucher (Mar. 22, 1983)).

*Treatment of the 1886 Lands under the 1980 Act*

After the passage of the Reorganization Act, "additional lands were acquired in trust for
the benefit of" the three communities.  *See* H.R. Rep. No. 96-1409, at 2 (1980).  As a result, the
three communities had "two classes of members: all members of the community who were
entitled to the benefits of the tribal lands acquired under the Reorganization Act and members
who were descendants of the 1886 Mdewakanton and who had exclusive rights to the benefits of

---

[28]The "Proceeds of Labor" accounts from which disbursements were made to the Lower
Sioux and Prairie Island Communities are the same accounts that the 1975 Report identified as
containing money derived from the 1886 lands.  *See* Def.'s Mot., Ex. C.  Pursuant to that report,
all money related to the 1886 lands then found in those accounts was transferred to Treasury
Account 147436 and its associated interest account 147936.  *Id.*  However, it would appear from
the source of the 1980 disbursements that subsequent to the 1975 transfer of $61,725.22, funds
derived from the 1886 lands were once again placed in the "Proceeds of Labor" Treasury
Accounts belonging to the Lower Sioux and the Prairie Island Communities.  The BIA's decision
to resume placing monies derived from the 1886 lands in accounts other than Account 147436
and its associated interest account 147936 is perplexing given the BIA's acknowledgement, in its
1975 Report, that transferring the funds to accounts 147436 and 147936 "restore[d] these funds
to the proper accounts."  *Id.*

the 1886 lands." *Id.* The property interests possessed by the two classes of members of the three communities were interspersed and resulted in "a checkerboard pattern of land used that severely diminishe[d] the effectiveness of overall land management programs and community development." *See id.* at 6. In a lame-duck session following the 1980 elections, Congress statutorily addressed the disparate property interests of the members of the three communities in December 1980, approximately one month after the communities and the BIA signed the agreement for the disbursement of the funds to the communities. *See* Act of Dec. 19, 1980, Pub. L. No. 96-557, 94 Stat. 3262.

The 1980 Act provided that the 1886 lands, which "were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians" under the Appropriations Acts, would henceforth be "held by the United States . . . in trust for" the three communities. 94 Stat. 3262.[29] The Act also contained a savings clause providing that the Act would not "alter" any rights then existing under "any contract, lease, or assignment entered into or issued prior to enactment of" the Act. *Id.* "Thus, all of the individuals then holding assignments to the 1886 lands retained their rights to use the land unaffected by the 1980 legislation." *Wolfchild VI*, 559 F.3d at 1235.

The United States continued to "oversee assignments that had been made before 1980 and were covered by Section 3 of the 1980 Act[,]" but no new assignments were made by the Department after the passage of the 1980 Act. Def.'s Mot. at 6-7. Upon the death of an assignee of the 1886 lands, the assignee's parcel of land was apparently shifted to the control of the

---

[29]The Act provided, in material part:

[A]ll right, title, and interest of the United States in those lands (including any structures or other improvement of the United States on such lands) which were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians under . . . [the Appropriations Acts], are hereby declared to hereafter be held by the United States —,

(1) with respect to the some 258.25 acres of such lands located within Scott County, Minnesota, in trust for the Shakopee Mdewakanton Sioux Community of Minnesota;
(2) with respect to the some 572.5 acres of such lands located within Redwood County, Minnesota, in trust for the Lower Sioux Indian Community of Minnesota; and
 (3) with respect to the some 120 acres of such lands located in Goodhue County, Minnesota, in trust for the Prairie Island Indian Community of Minnesota.
Sec. 2. The Secretary of the Interior shall cause a notice to be published in the Federal Register describing the lands transferred by section 1 of this Act. The lands so transferred are hereby declared to be a part of the reservations of the respective Indian communities for which they are held in trust by the United States.
Sec. 3. Nothing in this Act shall (1) alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act, or (2) restrict the authorities of the Secretary of the Interior under or with respect to any such contract, lease, or assignment.

94 Stat. 3262.

community that possessed an interest in the surrounding land pursuant to the 1980 Act.  *See id.* at 7 (citing *Gitchel v. Minneapolis Area Director*, 28 IBIA 46 (1995)).  The three communities also assumed the responsibility of "managing . . . and issuing new assignments" for those 1886 lands not assigned to loyal Mdewakanton prior to the passage of the 1980 Act.  *See* Def.'s Mot. at 6 (citing *Smith v. Haliburton*, 1982 U.S. Dist. Lexis 14243 *4-*5 (D. Minn. Aug. 23, 1982)).

Most importantly for the court's present purpose, the 1980 Act did not address the disposition of the funds that were derived from the 1886 lands then held by Treasury.  *See* 94 Stat. 3262; *Wolfchild VI*, 559 F.3d at 1259 n.14.  Despite the silence of the 1980 Act as to the funds, the Department acted on the presumption that the funds derived from the 1886 lands "could be turned over to the communities without notice to the 1886 beneficiaries."  *Wolfchild I*, 62 Fed. Cl. at 533.  As described above, the disbursement of the funds was agreed prior to the passage of the 1980 Act, and the funds were given to the three communities beginning approximately one month after the passage of the 1980 Act.

## STANDARDS FOR DECISION

### Motion to Amend

"The court should freely give leave [to amend pleadings] when justice so requires."  Rule 15(a)(2) of the Rules of the Court of Federal Claims ("RCFC").  The decision to grant or deny amendment of a complaint or answer is within the discretion of the trial court, but "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403 (Fed. Cir. 1989) (Under Rule 15(a), "discretion should be exercised liberally to permit such amendments.").  Absent a reason, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment[, or] futility of amendment[,]" the motion to amend should be granted.  *Foman*, 371 U.S. at 182; *Mitsui Foods, Inc.*, 867 F.2d at 1403-04; *see also Henry E. and Nancy Horton Bartels Trust ex rel. Cornell Univ. v. United States*, 88 Fed. Cl. 105, 111 (2009), *aff'd*, 617 F.3d 1357 (Fed. Cir. 2010).

### Motion to Dismiss

"Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action."  *OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens United for a Better Env't*, 523 U.S. 83, 88-89 (1998)).  Plaintiffs bear the burden of establishing the court's subject matter jurisdiction over their claim.  *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936).  In undertaking an analysis of subject matter jurisdiction, the court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiffs.  *See Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236-37 (1974), *overruled on other grounds as noted in Francis v. Giacomelli*, 588 F.3d 186, 192 n.1 (4th Cir. 2009)); *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1568-69 (Fed. Cir. 1993)).

Jurisdiction over a claim against the United States requires a waiver of sovereign immunity combined with a cause of action falling within the terms of that waiver. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citing *United States v. Mitchell*, 445 U.S. 535, 538-39 (1980) ("*Mitchell I*"); *United States v. Mitchell*, 463 U.S. 206, 216-17 (1983) ("*Mitchell II*")).  Such a waiver must be "unequivocally expressed." *Mitchell I*, 445 U.S. 535 at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).  The government has consented to suit through the Indian Tucker Act, 28 U.S.C. § 1505, which provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

Claims that would "otherwise be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group" include those founded upon the Tucker Act, 28 U.S.C. § 1491(a)(1), which waives immunity for claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

Although serving as a waiver of sovereign immunity, the Indian Tucker Act does not itself "create[] a substantive right enforceable against the Government by a claim for money damages." *White Mountain Apache*, 537 U.S. at 472.  As with the Tucker Act, a plaintiff grounding its claim on the Indian Tucker Act must demonstrate that some other source of law creates a money-mandating right or duty that falls within the ambit of the waiver of sovereign immunity. *See United States v. Navajo Nation*, __ U.S. __, __, 129 S.Ct. 1547, 1551-52 (2009). "The other source of law need not *explicitly* provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can be fairly interpreted as mandating compensation by the Federal Government." *Id.* at 1552 (internal quotations omitted).

"This 'fair interpretation' rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity." *White Mountain Apache*, 537 U.S. at 472; *see also Mitchell II*, 463 U.S. at 218-19 ("Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity.").  Accordingly, "[i]t is enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain Apache*, 537 U.S. at 473; *see Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007) ("Tucker Act jurisdiction requires merely that the statute be fairly interpreted or reasonably amenable to the interpretation that it mandates a right of recovery in damages.") (citations and internal quotations omitted).  "[A] fair inference will do." *White Mountain Apache*, 537 U.S. at 473.  If the court determines that the source of law upon which plaintiffs

rely is not money-mandating, the court must dismiss the claim for lack of subject matter jurisdiction under Rule 12(b)(1).  *Adair*, 497 F.3d at 1251.

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, __ U.S. __, __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court ruling on a 12(b)(6) motion to dismiss must not only "accept as true the complaint's undisputed factual allegations[,]" it must also "construe them in a light most favorable to the plaintiff."  *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

A claim is facially plausible when the plaintiff pleads facts such that "the court [may] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).  The plaintiff need not show that it is probable that it will succeed on the merits of the case, but it must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S.Ct. at 1949.  In the context of claims arising under the Tucker Act or the Indian Tucker Act, the standard applied under RCFC 12(b)(6) means that if "the court concludes that the facts as pled do not fit within the scope of a statute that is money-mandating, the court shall dismiss the claim on the merits under Rule 12(b)(6) for failing to state a claim upon which relief can be granted."  *Adair*, 497 F.3d at 1251; *see Greenlee Cnty. Ariz. v. United States*, 487 F.3d 871, 876-77 (Fed. Cir. 2007).

*Motion for Summary Judgment*

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  Whether a fact is material will, of course, depend upon the substantive law of the case.  *Id.*  A genuine dispute is one that "may reasonably be resolved in favor of either party."  *Id.* at 250.

The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Consequently, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).  If the moving party carries its burden of establishing that there is no genuine issue of material fact, the nonmoving party "may not rely merely on allegations or denials in its own pleadings; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  RCFC 56(e)(2); *see Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007) ("Once the moving party has

satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence.").  Where an examination of the record, "taken as a whole," could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial" and summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

Legally, this case is just as tangled and convoluted as the historical record of events.

### A.  *Amendment of Complaints*

Plaintiffs request leave of the court to amend their complaints to state counts asserting their right to the funds derived from the 1886 lands based upon the statutory use restrictions contained in the Appropriations Acts.  *See* Pls.' Mot. to Am. Compl. ("Pls.' Mot. to Am."); Pls.' Sixth Am. Compl. ("Sixth Am. Compl.").  Plaintiffs' proposed amendments rest on the same operative facts as those addressed in their prior complaints; the recasted claims simply reflect the basis on which the Federal Circuit decided *Wolfchild VI* and the remand ordered by that decision. *See* 559 F.3d at 1259 n.14.[30]  The government will not suffer prejudice as a result of these amendments as it has long had notice of plaintiffs' demand for relief based upon the terms of the Appropriations Acts and of the factual history surrounding this case.  *See Foman*, 371 U.S. at 182; *Mitsui Foods, Inc.*, 867 F.2d at 1403-04.[31]

---

[30]Included in plaintiffs' proposed sixth amended complaint are other alleged counts that: (1) assert that the statutory use restrictions created a duty on the part of the government to collect lease and other revenue from the three communities and distribute gaming proceeds to the plaintiffs under the Indian Gaming Regulatory Act, Pub. Law No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 18 U.S.C. § 1166 and 25 U.S.C. §§ 2701-21) ("Indian Gaming Act"), Sixth Am. Compl. ¶¶ 83-98; (2) aver that the Department's adoption of a so-called "recognition test" for determining the identity of the loyal Mdewakanton violated the statutory use restrictions, Sixth Am. Compl. ¶¶ 99-106; and (3) ask the court to issue an order setting aside provisions in the three communities' constitutions, ordinances, resolutions, censuses, rolls, and tribal revenue-allocation plans "which are repugnant to the [s]tatutory [u]se [r]estriction[s]" and remanding the matter to the Department of Interior pursuant to 28 U.S.C. § 1491(a)(2), Sixth Am. Compl. ¶ 116.  The court will not parse the individual paragraphs of plaintiffs' amended complaint in ruling on plaintiffs' motion to amend; rather, the merits of plaintiffs' particular claims will be addressed *infra*, after the court determines whether the motions to amend should be granted as a general matter.

[31]The government denigrates the plaintiffs' basis for the amendment by contending that it relies on "the appellate court's passing comments" regarding the Appropriations Acts.  Def.'s Opp'n to Pl.'s Mots. to Am. Compls. ("Def.'s Opp'n") at 9.  Yet, that disparagement ignores the remand order.  The Federal Circuit remanded the case to this court address, to the extent necessary, the funds derived from the 1886 lands, *see Wolfchild VI*, 559 F.3d at 1259 n.14; in these circumstances, justice would require that the plaintiffs be given leave to amend their complaints to take account of the Federal Circuit's remand.  *See* RCFC 15(a)(2).

The government asserts, however, that such amendments would be "futile" and plaintiffs' claims also would be barred by the statute of limitations. *See* Def.'s Opp'n at 5, 15; Def.'s Mot. at 30-36. The plaintiffs respond that amendment is necessary in light of the Federal Circuit's remand order and that this court's prior ruling regarding the statute of limitations in *Wolfchild I*, 62 Fed. Cl. at 547-49, largely dispenses with the government's present statute-of-limitations argument. *See* Pls.' Reply to Def.'s Opp'n to Pls.' Mot. to Am. ("Pls.' Reply") at 4-7, 14-17.

1. *Futility.*

Where an amendment would be futile, a court should disallow the plaintiff's motion to modify its complaint. *See Foman*, 371 U.S. at 182; *Mitsui Foods, Inc.*, 867 F.2d at 1403-04. In assessing the "futility" of an amendment, the court should apply "the same standard of legal sufficiency as [it] applies under Rule 12(b)(6)." *Merck & Co., Inc. v. Apotex, Inc.*, 287 Fed. Appx. 884, 888 (Fed. Cir. 2008) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d. Cir. 1997)); *see also Taylor Consultants, Inc. v. United States*, 90 Fed. Cl. 531, 546 (2009) (same). "Thus, an amendment to add a []claim is futile if the amendment fails to state a claim upon which relief can be granted." *Merck*, 287 Fed. Appx. at 888.

The government argues that an amendment to plaintiffs' complaint would be "futile" because "the Federal Circuit did not recognize a viable claim for statutory use restriction[s] in its opinion holding that [p]laintiffs could not assert a claim for breach of trust" and that such a claim would be "directly contrary to the Federal Circuit's findings and cannot be a basis for a lawsuit against the United States." Def.'s Opp'n at 6, 9.[32] The government additionally asserts that "[t]o the extent that a[ny] statutory use restriction[s] w[ere] created by the Appropriations Acts, any interest [p]laintiffs may have had in the . . . funds w[ere] terminated by the 1980 Act." *Id.* at 14. Plaintiffs counter that the Federal Circuit's statement that "the Appropriations Acts are best interpreted as merely appropriating funds subject to . . . statutory use restriction[s], and not creating a trust relationship[,]" *Wolfchild VI*, 559 F.3d at 1240, must be read to mean that the Court of Appeals recognized that plaintiffs had a viable claim predicated on the statutory use restrictions and that such recognition is "the law of the case." Pls.' Reply at 4-7.[33]

---

[32]In its opposition to plaintiffs' motion to amend, the government alleges that the amendment is futile also because the court lacks subject matter jurisdiction over the case. Def.'s Opp'n at 11-14. The court addresses this argument in its analysis of the government's motion to dismiss for lack of subject matter jurisdiction.

[33]The "law of the case" doctrine provides that when a case has been once decided by a superior court and remanded to the lower court, whatever was before the superior court and disposed of by its decree, is considered finally settled. The lower court is bound by the decree as the law of the case, and must carry it into execution, according to the mandate. *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895); *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) (The law of the case doctrine "prevent[s] the relitigation of issues that have been decided and . . . ensure[s] that trial courts follow the decision of appellate courts.") (citation omitted); *see also Banks v. United States*, 76 Fed. Cl. 686, 689-90 (2007) (describing the law of the case doctrine).

Both parties misapprehend the Federal Circuit's opinion.  The Federal Circuit indeed held that the Appropriations Acts were subject to statutory use restrictions, *see Wolfchild VI*, 559 F.3d at 1240, but it quite explicitly abstained from addressing the merits of any claim that plaintiffs would have under such restrictions.  The court stated:

> The parties devote some attention to the question whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds.  *See Wolfchild I*, 62 Fed. Cl. at 549-50.  *That issue does not affect our analysis of the two certified questions, however, and we leave that issue to be addressed, to the extent necessary, in further proceedings before the trial court.*

*Wolfchild VI*, 559 F.3d at 1259 n.14 (emphasis added).  The Federal Circuit's ruling was thus limited to its answer to the two questions certified for interlocutory appeal – namely, that the Appropriations Acts did not create a trust for the loyal Mdewakanton and that any trust so created in land would have been terminated by the 1980 Act.  *See id.* at 1255, 1260.[34]  On the one hand, recognition that the Appropriations Acts were subject to statutory use restrictions cannot be construed to mean that it concluded that plaintiffs have a meritorious claim based on those restrictions.  On the other hand, neither can the Federal Circuit's ruling be read to foreclose the possibility that the statutory use restrictions, which it recognized, could serve as the basis for a legitimate claim by the plaintiffs.

Thus, there is no "law of the case" as to the merits of plaintiffs' statutory-use-restrictions claim and as to the accompanying question of whether it was lawful for the Department to disburse the funds at issue to the communities.  Accordingly, the court may, and, indeed, must — given the parties' contentions — examine the merits of plaintiffs' claims under the Federal Circuit's remand order.  *See Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382 (Fed. Cir. 1999) ("[W]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues.") (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)); *see also Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed. Cir. 1997) ("Upon return of its mandate, the district court cannot give relief beyond the scope of th[e] mandate, but it may act on 'matters left open by the mandate.'") (quotation omitted).

Plaintiffs' proposed amendments could have legal viability.  The statutory use restrictions reflect mandatory terms of the Appropriations Acts and may be sufficient to provide a "fair inference" that the government had a money-mandating duty to the loyal Mdewakanton and their lineal descendants that was contravened when the Department disbursed the funds held in Treasury trust accounts to the three communities.  As the Federal Circuit has observed: "The court has found Congress provided such damage remedies where the statutory text leaves the government no discretion over payment of claimed funds."  *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005); *see also Hopi Tribe v. United States*, 55 Fed. Cl.

---

[34]The Federal Circuit's conclusions as to these two issues certainly constitute "the law of the case."  The court accordingly cannot revisit these matters.

81, 86-87 (2002) ("If the language and effect of the statute is mandatory, then the court possesses jurisdiction.") (quoting *Lewis v. United States*, 32 Fed. Cl. 59, 64 (1994)).  Further, plaintiffs' claims find support in *Reuben Quick Bear v. Leupp*, 210 U.S. 50 (1908).  Under *Quick Bear*, a court should trace the historical origins of the funds at issue and determine whether the funds can be characterized as mere gratuitous appropriations or whether the funds are in reality, or have been treated as though they are, "Indians' money."  *See id.* at 77-82.

Any claim plaintiffs may have based on statutory use restrictions to pre-1980 funds is also unaffected by the 1980 Act.[35]  When interpreting a statute, the court must look first to the statutory language.  *See Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1323 (Fed. Cir. 2010) (citing *Jimenez v. Quarterman*, 555 U.S. 113, ___, 129 S.Ct. 681, 685 (2009)); *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004)); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").  In this instance, however, the statute contains no text pertaining to the disposition of the funds.  *See* 94 Stat. 3262; *Wolfchild VI*, 559 F.3d at 1259 n.14 ("[T]he 1980 Act was silent as to the disposition of th[e] funds.").

The Department simply presumed that it could distribute the funds to the three communities on the basis of the 1980 Act, and memorialized that view in a letter from the Field Solicitor to the Area Director.  J.A. 00878-80 (Letter from Elmer T. Nitzschke to Edwin Demery (Feb. 6, 1981) ("Nitzschke 1981 Letter")); *see Wolfchild I*, 62 Fed. Cl. 532-33.  Where the text of statute does not address a particular issue, an agency's interpretation of the statute as contained in informal opinion letters or otherwise not embodied in regulations is "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), "but only to the extent that those interpretations have the 'power to persuade.'"  *Christensen v. Harris Cnty*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140); *id.* ("Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.") (referring to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see also United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) ("Interpretive choices" of agencies may be entitled to *Skidmore* deference).

In applying the "limited deference" of *Skidmore*, the court considers "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Skidmore*, 323 U.S. at 140; *see Mead*, 533 U.S. at 228 (same); *see also Cathedral*

---

[35]In support of its argument that the 1980 Act terminated any interest plaintiffs may have had in the funds, the government quotes the Federal Circuit's opinion in *Wolfchild VI* noting that "[t]he fact that the savings clause was regarded as necessary to protect the current assignees is a clear indication that the drafters viewed the Act as otherwise terminating any equitable interests of the 1886 Mdewakantons."  Def.'s Opp'n at 15.  The government fails to quote, however, the last three words of that sentence, which read: "*in those lands.*"  *Wolfchild VI*, 559 F.3d at 1259 (emphasis added).  Selective quotation such as this does little to aid the government's case.

*Candle*, 400 F.3d at 1366 (Under *Skidmore*, the court should "defer to an agency interpretation of the statute that it administers if the agency has conducted a careful analysis of the statutory issue, if the agency's position has been consistent and reflects agency-wide policy, and if the agency's position constitutes a reasonable conclusion as to the proper construction of the statute, even if we might not have adopted that construction without the benefit of the agency's analysis.").

The court also considers the extent to which the agency's interpretation relies upon its "specialized experience and broader investigations and information." *Mead*, 533 U.S. at 234 (quoting *Skidmore*, 323 U.S. at 139); *see also Cathedral Candle*, 400 F.3d at 1367 (applying *Skidmore* deference, taking into account the International Trade Commission's "specialized expertise" and broader access to information in ruling on Commission's exclusion of plaintiffs from the list of potential affected domestic producers under the Byrd Amendment, 19 U.S.C. § 1675c); *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1356-60 (Fed. Cir. 2003) (considering the United States Customs Service's "specialized experience" and "expertise" in classifying goods in ruling on Customs Service's tariff classification for certain imported textile costumes).

The majority of the Field Solicitor's letter is devoted to interpreting the 1980 Act as it applied to the 1886 lands, *see* J.A. 00878-80 (Nitzschke 1981 Letter); however, in the final paragraph, the Field Solicitor addresses the funds:

> One further matter for consideration is the accumulated revenues currently held by the Bureau identifiable to the lands in question. It is my understanding that the apportioned share belonging to or identified for the Shakoppee Community has already been turned over to that group. Similar action should be taken as to the other two communities claiming an interest in these monies. As to how the respective communities can utilize these funds, it is interesting to note, as pointed out in the Secretary's letter to OMB that the cost of acquiring the land in question was offset against the recovery by the Mdewakanton and Wahpakoot[a] Bands of S[i]ou[]x Indians against the United States (57 Court of Claims 357 (1932 [– *sic* – 57 Ct. Cl. 357 [(1922)]]) the beneficiaries of which included many individuals other than those for whom such land was held by the United States. In light of this bit of information it may be that tribal use of these impounded funds may include other than those persons previously identified as eligible Mdewakantons for purposes of occupying the land in question.

J.A. 00879 (Nitzschke 1981 Letter).

This singular paragraph appears to constitute the entirety of the "analysis" the Department devoted to considering the applicability of the 1980 Act to the funds.[36] The

---

[36]The only additional contemporaneous document in the record that touches on the issue of income from the 1886 lands is a letter from the Acting Area Director of the BIA dated January 15, 1981 to the Chairman, Community Council, Lower Sioux Community. J.A. 00876 (Letter from David Granum to Leon Columbus). In that letter, the Director simply states that "income derived from the[] [1886] lands *in the future* will be utilized as other income from tribal land."

letter shows that the Department did not engage in a thorough consideration of the issue. In fact, it did not consider the issue at all; it simply assumed, without deliberation or analysis, that the Act applied.[37]

The Field Solicitor's opinion regarding the disposition of the funds also was issued after one third of the funds had already been distributed to the Shakopee Community.  J.A. 00879 (*Nitzschke 1981 Letter*) ("It is my understanding that the apportioned share belonging to or identified for the Shakopee Community has already been turned over to that group."); Def.'s Mot., Ex. K (Public Voucher (Dec. 30, 1980)) (documenting distribution of $37,835.88 to the Shakopee Mdewakanton).  Thus, the Department's "consideration" of the issue, to the extent that the Field Solicitor's letter can be deemed as such, only factored into the agency's action after the distributions had begun.

Consequently, the court cannot conclude that the Department engaged in the sort of thoughtful analysis of the fund-disposition issue that warrants *Skidmore* deference. *See, e.g., Federal Nat'l Mortg. Ass'n v. United States*, 379 F.3d 1303, 1308-10 (Fed. Cir. 2004) (concluding that Internal Revenue Service's interpretation of a statute was not entitled to *Skidmore* deference where it "set[] forth no reasoning in support of its conclusion" and was "unaccompanied by any supporting rationale," but allowing an agency interpretation to stand based upon the ground that a waiver of sovereign immunity must be strictly construed.).

Furthermore, the action by the Department after adoption of the 1980 Act was directly contrary to its conclusions respecting the status and proper ownership of the funds prior to 1980.  *See supra*, at 18-20 (addressing BIA's positions from 1975-1980). This *volte face* by the Department as to the fundamental question of who was entitled to the pre-1980 funds disfavors deferring to the Department's actions after the 1980 Act was adopted.  *See Cathedral Candle Co.*, 400 F.3d at 1367 (indicating that where the agency's current position is "inconsistent with positions the [agency] . . . has previously taken," it may counsel against *Skidmore* deference) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988)).  In short, although the Department certainly possesses "specialized experience" in dealing with Native American matters, the Nitzschke 1981 Letter did not draw on any expertise or specialized information to interpret the scope of the 1980 Act.

Finally, the agency's position does not constitute "a reasonable conclusion as to the proper construction of the statute."  *Cathedral Candle Co.*, 400 F.3d at 1366.  At

---

*Id.*  The letter does not include any opinion on the status of the income or funds derived from the 1886 lands prior to the 1980 Act.  *Id.*

[37]The Field Solicitor's citation of the fact that the 1922 judgment in the *Medawakanton* case reflected an offset for funds provided by the Appropriations Acts was inapposite.  The judgment in that case did not modify, and could not have modified, the statutory terms of the Appropriations Acts.

every possible point, the 1980 Act specifies that it only applied to the 1886 lands.  The name of the Act is "An Act to provide that *certain land* of the United States shall be held by the United States in trust for certain communities of the Mdewakanton Sioux in Minnesota."  94 Stat. 3262 (emphasis added).  Although the title of a statute cannot limit the plain meaning of the text, "statutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of statute.'"  *Florida Dep't of Revenue v. Piccadilly Cafeteria, Inc.*, 554 U.S. 33, 47 (2008) (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002)).  The 1980 Act states that "all right, title, and interest of the United States in *those lands (including any structures or other improvements of the United States on such lands)* . . . are hereby declared to hereafter be held by the United States [in trust for the three communities]."  1980 Act, § 1, 94 Stat. 3262 (emphasis added).  It then describes the lands in detail down to the hundredths of an acre.  *See id.* § 2.  It finally requires the Secretary to publish notice in the Federal Register describing the lands being transferred and recites the so-called "savings clause" preserving any prior contract, lease, or assignment interests in the land.  *Id.* §§ 2, 3.

Notably, the sponsor of the legislation in the House, Representative Richard Nolan of Minnesota, was aware of the funds' existence.  *See* J.A. 02547-49 (Area Director's 1975 Mem.).  In introducing the bill, Rep. Nolan defined its scope as "legislation which will change the legal status of *tracts of land* in Minnesota presently held by the United States for exclusive use by the descendants of the Mdewakanton Sioux who resided there on May 20, 1886."  26 CONG. REC. 8,897 (emphasis added).  Rep. Nolan did not mention the funds in his introductory statement, *see id.* at 8,897 to 8,898, nor were the funds mentioned in any of the other legislative history materials surrounding the 1980 Act.  The specific choice not to include a provision for disposition of the funds could not have been attributable to inadvertence particularly in light of the suggestion in the Area Director's 1976 Memorandum that the disposition of the funds needed to be included "with legislation converting the title" to enable the Department to distribute the funds to the three communities.  *See* J.A. 01116 (Area Director's 1976 Mem.).  Instead, this is yet another instance where "[t]he best evidence of congressional intent is the plain meaning of the statutory language at the time Congress enacted the statute."  *Strategic Hous. Fin. Corp. of Travis Cnty.*, 608 F.3d at 1323.

The silence of the 1980 Act as to the pre-1980 funds, particularly in light of the detailed nature of the statute and the legislative history, cannot be read to terminate any interest plaintiffs may have in those funds.  The 1980 Act also did not constitute a repeal, "implied or otherwise," of the Appropriations Acts.  *Wolfchild VI*, 559 F.3d at 1258 n.13.  Thus, the court will not defer to the Department's actions disposing of the pre-1980 funds after passage of the 1980 Act, and it instead concludes that the 1980 Act does not affect plaintiffs' claims in those funds.[38]

---

[38]However, as explained *infra*, the 1980 Act does affect plaintiffs' claim that they are entitled to funds derived from the 1886 lands after the passage of the 1980 Act.

   2.   *Statute of limitations.*

   Generally, suits against the United States filed in this court must be filed within six years
after accrual of the cause of action.  28 U.S.C. § 2501.  Because this statute of limitations
circumscribes the scope of the government's waiver of sovereign immunity, it is "jurisdictional"
in nature and must be construed strictly.  *See John R. Sand & Gravel Co. v. United States*, 552
U.S. 130, 133-34 (2008); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-
77 (Fed. Cir. 1988).  The court may not consider whether a case warrants equitable tolling, *see
John R. Sand & Gravel Co.*, 552 U.S. at 133-34, or imply exceptions to the limitations period.
*See Hopland Band of Pomo Indians*, 855 F.2d at 1577.  However, in this instance Congress has
acted by statute to toll the limitations period.

   In a series of appropriations acts for the Department of the Interior beginning in 1990,
Congress began enacting "provisions which suspend accrual of the statute of limitations for
certain tribal trust claims."  *Shoshone Indian Tribe of the Wind River Reservation, Wyo. v.
United States*, 93 Fed. Cl. 449, 459 (2010).[39]  At the time of the plaintiffs' filing of their initial
complaint in this case, the version of that provision, referred to as "the Indian Trust Accounting
Statute" or "ITAS," provided:

      [N]otwithstanding any other provision of law, the statute of limitations shall not
      commence to run on any claim, including any claim in litigation pending on the
      date of the enactment of this Act, concerning losses to or mismanagement of trust
      funds, until the affected tribe or individual Indian has been furnished with an
      accounting of such funds from which the beneficiary can determine whether there
      has been a loss.

Pub. L. No. 108-108, 117 Stat. 1241, 1263 (Nov. 10, 2003).  The Federal Circuit has held that
the Indian Trust Accounting Statute displaces the six-year general statute of limitations for
claims falling within its terms, and that it postpones the beginning of the limitations period until
an accounting has been provided to the affected beneficiary.  *Shoshone Indian Tribe of Wind
River Reservation v. United States*, 364 F.3d 1339, 1346-47 (Fed. Cir. 2004).[40]

   The government argues that the Indian Trust Accounting Statute or "Appropriations
Rider," as it calls the provision, does not apply to plaintiffs' claims because those claims are
"based upon funds and lands which were not held in trust by the United States for [p]laintiffs."
Def.'s Mot. at 35; *see also* Def.'s Opp'n at 16-17.  The government also argues that the plaintiffs
assert "mismanagement-styled claims" not cognizable under the ITAS.  Def.'s Mot. at 36.
Plaintiffs respond that the Department's placement of funds derived from the 1886 lands into

   [39]A version of the 1990 provision has been adopted each year since, with minor changes.
*See Shoshone*, 93 Fed. Cl. at 459 n.9.

   [40]In *Shoshone*, the Federal Circuit was interpreting a prior version of the Indian
Trust Accounting Statute, Pub. L. No. 108-7, 117 Stat. 11 (Feb. 20, 2003), which none-
theless was identical to the one applicable to this case.  *See* 364 F.3d at 1344.

Treasury trust fund accounts places their claims squarely within the ambit of the ITAS.  Pls.'
Reply at 14-17; *see also* Pls.' Cross. Mot. at 47-48.

The government is mistaken in its view that the Federal Circuit's ruling regarding
plaintiffs' trust claim dispenses with the statute-of-limitations issue.  While the monies at issue
were derived from lands said to be held under use restrictions and not in trust for the loyal
Mdewakanton, *see Wolfchild VI*, 559 F.3d at 1255, it does not follow that funds stemming from
those lands could not have been held in trust by the government.[41]

The Department of Interior has adopted guidelines that govern the management by the
BIA of "Trust Funds for Tribes and Individual Indians."  *See* 25 C.F.R. Chapter I, Part 115.
Those guidelines define "trust funds" as "money derived from the sale or use of trust lands,
*restricted fee lands*, or trust resources and *any other money that the Secretary must accept into
trust*." 25 C.F.R. § 115.002 (emphasis added).  The monies at issue ostensibly would fit under
the heading of money derived from "restricted fee lands."  However, that term has been defined
in the Department's regulations as having a restrictive meaning pertinent to allottees only.  *Id.*
("Restricted fee land(s) means the land the title to which is held by an individual Indian or a tribe
and which can only be alienated or encumbered by the owner with the approval of the Secretary
because of limitations contained in the conveyance instrument pursuant to federal law.")  The
Federal Circuit's ruling that the Appropriations Act did not vest any form of title to the 1886
lands in the loyal Mdewakanton as a group or in the individual assignees forecloses classifying
the funds at issue as money derived from "trust lands" or "restricted fee lands."

Nonetheless, "trust funds" are also defined as embracing "any other money that the
Secretary must accept into trust." 25 C.F.R. § 115.002.  At the time of the 1975 Report by the
BIA, the funds at issue were held in three Indian Money "Proceeds of Labor" Treasury Accounts

---

[41]Where the government holds any Indian money, there is a strong presumption that those
funds are held in trust.  *See, e.g., Loudner v. United States*, 108 F.3d 896, 900 (8th Cir. 1997)
("[T]here is a presumption that absent explicit language to the contrary, *all funds* held by the
United States for Indian tribes are held in trust." (quoting *Rogers v. United States*, 697 F.2d 886,
890 (9th Cir. 1983) (emphasis added)); *Moose v. United States*, 674 F.2d 1277, 1281 (9th Cir.
1982) ("[W]here the United States holds funds for Indian tribes, a trust relationship exists unless
there is explicit language to the contrary."); *American Indians Residing on Maricopa-Ak Chin
Reservation v. United States*, 667 F.2d 980, 1002 (Ct. Cl. 1981) ("Where the [g]overnment takes
on or has control and supervision over tribal money or property, the normal relationship is
fiduciary unless Congress expressly has provided otherwise.  Defendant must account for all
Indian money that is in its hands, both that classified as Indian Money Proceeds of Labor and
deposited in the United States Treasury and that called Individual Indian Moneys and held
outside the Treasury.").  "This 'trust relationship extends not only to Indian Tribes as
governmental units, but to tribal members living collectively or individually, on or off the
reservation.'" *Loudner*, 108 F.3d at 901 (quoting *Little Earth of United Tribes, Inc. v.
Department of Housing and Urban Dev.*, 675 F. Supp. 497, 535 (D. Minn. 1987), *amended*, 691
F. Supp. 1215 (D. Minn. 1988), *aff'd*, 878 F.2d 236 (8th Cir. 1989)); *cf. Morton v. Ruiz*, 415 U.S.
199, 236 (1974) ("The overriding duty of our Federal Government to deal fairly with Indians
wherever located [on or off reservation] has been recognized by this Court on many occasions.").

(Account 147158, "Proceeds of Labor, Lower Sioux Indian Community," Account 147043, "Proceeds of Labor, Prairie Island Indian Community," and Account 147436, "Proceeds of Labor, Mdewakanton and Wahpakoota.")[42] and four IIM accounts.  *See* Def.'s Mot., Ex. C. Pursuant to the 1975 Report, all of the funds were placed in Treasury Account 147436 "Proceeds of Labor, Mdewakanton and Wahpakoota" and its associated interest account, 147936.  *See id.*

Proceeds-of-Labor accounts are statutorily classified as "trust funds" accounts.  *See* Permanent Appropriation Repeal Act of 1934, ch. 756, § 20, 48 Stat. 1224, 1233 (codified as amended at 31 U.S.C. § 1321(a)(20) (2004)) (classifying "Indian moneys, proceeds of labor, agencies, schools, and so forth" as "trust funds"); *see also Short v. United States*, 50 F.3d 994, 998 (Fed. Cir. 1995) (subjecting Proceeds-of-Labor accounts to the statutory requirements applicable to "trust funds" and funds "held in trust" by the United States); *Red Lake Band of Chippewa Indians v. Barlow*, 834 F.2d 1393, 1395 n.4 (8th Cir. 1987) ("The Secretary apparently maintains four general trust accounts in the name of the Red Lake Band.  The one of primary concern here is the 'Proceeds-of-Labor' account.").

That Proceeds-of-Labor accounts are "trust fund" accounts finds further support in the numbers designated for the accounts.  In *Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 69 Fed. Cl. 639, 653 (2006), the court examined the Treasury accounting system used "to account for trust and other moneys received by the United States government."  Under that system, "all appropriated moneys and funds collected by the various departments of government are assigned account numbers that indicate the class of receipt or appropriation."  *Id.* Treasury funds are given "master symbols" to designate the type of funds within the account.  *Id.* (quoting *King v. United* States, 107 Ct. Cl. 223, 234-35 (1946)).[43]  Master symbols 0001 to 5999 designate "General Funds," and master symbols 6000 to 6999 designate "Special Funds."  *Id.*

---

[42]Proceeds-of-Labor accounts were created consequent upon adoption of the Act of March 3, 1883, ch. 141, 22 Stat. 582, 590, which provided, in pertinent part: "[T]he proceeds of all pasturage sales of timber, coal, or other product of any Indian reservation . . . and not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such tribe."  In 1887, Congress authorized the Secretary of the Interior to use the money deposited into these accounts "for the benefit of several tribes on whose account said money was covered in, in such way and for such purposes as in his discretion he may think best."  Act of March 2, 1887, ch. 320, 24 Stat. 449, 463.  The 1883 and 1887 acts were later amended in 1926 to provide that "all miscellaneous revenues derived from Indian reservations, agencies, and schools which are not required by existing law to be otherwise disposed of, shall be covered into the Treasury . . . under the caption 'Indian moneys, proceeds of labor.'"  Act of May 17, 1926, ch. 309, § 1, 44 Stat. 560 (now codified as 25 U.S.C. § 155).  The 1926 Act also authorized the Secretary to expend the funds "for the benefit of the Indian tribes, agencies, and schools on whose behalf they are collected."  *Id.*  In 1982, Congress abolished the use of Proceeds-of-Labor funds effective September 30, 1982.  *See* 25 U.S.C. § 155b.

[43]The *King* decision is set out in full only in the Court of Claims reporter and on Lexis Nexis.  A portion of the decision is also reported at 68 F. Supp. 206, and that portion is available on-line via Westlaw, but neither the report in the Federal Supplement nor in Westlaw on-line reproduces the portion of the *King* decision quoted and cited in *Chippewa* and relevant here.

(quoting *King*, 107 Ct. Cl. at 234-35).  "Master symbols 7000 to 9999 designate 'Trust Funds,' which represent moneys received by the United States for the purposes specified in and for disbursement in accordance with the terms of the arrangements under which they are accepted." *Id.* at 653 (quoting *King*, 107 Ct. Cl. 234-37)

The full account numbers assigned by Treasury to accounts that held the funds at issue were account nos. 14x7158, 14x7043, and 14x7436, with all of the funds ultimately being deposited in account 14x7436.  *See* Def.'s Mot., Ex. C (1975 Report).  "The numerical code '14' [placed before each account number] identifies the Department of Interior, while the letter 'x' denotes that the appropriation is ongoing and without a fiscal year limitation under the authority of the [Permanent Appropriation Repeal] Act[, codified as amended at 31 U.S.C. § 1321]." *Chippewa*, 69 Fed. Cl. at 653 (citing *King*, 107 Ct. Cl. at 236).  The actual accounts numbers of 7158, 7043, and 7436 thus fall within the range reserved for trust funds only.[44]

Similarly, according to the Department of Interior's guidelines, an IIM account is "an interest bearing account *for trust funds held by the Secretary* that belong to a person who has an *interest in trust assets*."  25 C.F.R. § 115.002 (emphasis added).  IIM accounts are "under the control and management of the Secretary."  *Id.*  As mentioned previously, there are three types of IIM accounts: unrestricted, restricted, and estate accounts, *id.*, but it is not readily apparent which type of IIM accounts held the funds at issue.  Regardless, under the Department's own regulations, IIM accounts are trust fund accounts.  *See also American Indians Residing on Maricopa-Ak Chin Reservation*, 667 F.2d at 1002 ("IIM funds are recognized as trust funds.").

The funds derived from the 1886 lands and placed in Proceeds-of-Labor and IIM accounts thus fall under the heading of "any other money that the Secretary must accept into trust."  25 C.F.R. § 115.002.  Nonetheless, the conclusion that the funds derived from the 1886 lands were held "in trust" and come within the reach of the Indian Trust Accounting Statute does not end the court's inquiry as to the applicability of the ITAS.  The ITAS requires that plaintiffs' claims not only concern "trust funds" but also that those claims fit within the scope of "losses to or mismanagement of" such trust funds.  117 Stat. at 1263.

The government argues that "any rights here [p]laintiffs assert to the [1886 monies] . . . on the basis of funds mismanagement-styled claims should be rejected for the same reasons th[e] [c]ourt rejected [p]laintiffs' breach of contract claim."  Def.'s Mot. at 36.  This contention appears to involve two separate arguments, *viz.*, (1) that the court's reasoning expressed in its conclusion that the Indian Trust Accounting Statute was inapplicable to plaintiffs' breach of contract claims is germane to the present question, and (2) that the court should dismiss the plaintiffs' arguments because they are mismanagement-style claims of the type rejected in *Shoshone*, 364 F.3d 1339.

---

[44]*King's* recitation of the Treasury accounting system, which cited to general regulations of the Comptroller General promulgated in 1928 and amended in 1936, comports with regulations in effect during the time period in which the funds at issue were being deposited into the Treasury.  *See* General Regulations No. 84 – 2d Revision, 30 Comp. Gen. 541, 543 (Nov. 20, 1950).

In *Wolfchild I*, the court concluded that the Indian Trust Accounting Statute did not apply to plaintiffs' breach of contract claims because the ITAS only applies to "trust mismanagement and to specific kinds of losses[,]" not claims based on a breach of contract. 62 Fed. Cl. at 548. That reasoning, however, is inapposite regarding claims respecting the funds. Because the funds at issue were held "in trust" specifically by statute, the ITAS applies by its express terms.

The government's second argument recalls a contention that it made, and lost, in *Shoshone*. In *Shoshone*, the government argued that the ITAS would only encompass "mismanagement or loss of tribal funds that were actually collected and deposited into the tribal trusts by the [g]overnment." 364 F.3d at 1349. The Federal Circuit rejected "the [g]overnment's narrow reading of the [ITAS]" and accepted that some losses to trust funds could occur prior to collection. *Id.* at 1349-50.[45]

The plaintiffs assert a loss to and mismanagement of the funds derived from the 1886 lands caused by the government's disbursal of such funds to the three communities, and not to eligible Mdewakanton. *See* Pls.' Cross-Mot. at 47-48. Those funds were in the government's possession and deposited into trust funds by the government. The Federal Circuit has held that losses to trust funds within the government's possession fall under the ITAS, *see Shoshone*, 364 F.3d at 1349-50, and indeed, it is difficult to imagine what type of claim would fall under "losses to or mismanagement of trust funds" if the disbursement of the entire funds at issue to the wrong beneficiaries is not included.

It is also evident that plaintiffs' claims concern trust funds, not, as the government argues, trust assets. The funds may have been derived from various leases and licenses in and for the 1886 lands, but the issue at hand is the government's payment of the funds to the three communities. Plaintiffs' claims are thus distinguishable from claims the Federal Circuit and this court have concluded are not within the reach of ITAS because they concern trust assets. *See, e.g., Shoshone*, 364 F.3d at 1350 (claim concerned "mineral trust assets"); *Simmons v. United States*, 71 Fed. Cl. 188, 192-93 (2006) (claim concerned lumber harvested from plaintiff's land).

Accordingly, the court finds that the Indian Trust Accounting Statute is applicable to plaintiffs' claim that the government mismanaged and caused a loss to the monies derived from the 1886 lands, such monies being held in trust for the plaintiffs. The government does not assert nor is there any evidence before the court that the plaintiffs have been provided with an accounting of the funds. *See* 117 Stat. at 1263; *Shoshone*, 364 F.3d at 1347 ("The clear intent of the [ITAS] is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed."). Consequently, the ITAS resuscitates and preserves plaintiffs' claims, thereby displacing the general six-year statute of limitations, 28 U.S.C. § 2501.

---

[45]In a related view, the Federal Circuit opined in *Shoshone* that claims pertaining to losses to trust *assets*, rather than trust *funds*, are outside the scope of the ITAS. *See* 364 F.3d at 1350; *id.* at 1351 (noting that the Federal Circuit's interpretation of "losses . . . to trust funds" limited that phrase to "accounts receivable due and owing to the Tribes"); *see also Rosales v. United States*, 89 Fed. Cl. 565, 580 (2009) (summarizing *Shoshone*).

3. *Plaintiff-Intervenors' motion to amend.*

The Julia DeMarce Group and the Harley D. Zephier Group of Plaintiff-Intervenors have filed motions and proposed complaints containing an additional count, which alleges that the government violated its obligation to set aside land under the Act of Feb. 16, 1863 § 7, 12 Stat. 652, 654. The government opposes the motion arguing that the Federal Circuit's conclusion that the second Act of 1863, 12 Stat. 819, superseded the first Act of 1863 means that plaintiff-intervenors cannot base a claim on the first Act of 1863. Def.'s Opp'n at 18. The government also alleges that this claim would be barred by the statute of limitations as "[p]laintiffs were on notice of their claim six years before filing their complaints, even as early as 1888, when the first of the Appropriations Acts were passed and the land designated under this particular statute was not acquired for the benefit of the loyal Mdewakanton." *Id.* at 18-19. Notwithstanding these arguments by the government, the salient threshold question realistically is whether the first Act of 1863 can be read as giving rise to a money-mandating duty under controlling precedent — a question that neither party has addressed. The court will grant intervenor-plaintiffs' motion to amend such that this threshold issue might be addressed.

B. *Motion to Dismiss and Competing Motion for Partial Summary Judgment*

1. *Entitlement to the funds obtained from the 1886 lands prior to the adoption of the 1980 Act.*

The government makes an overarching argument that the statutory mandates contained in the Appropriations Acts are essentially immaterial to plaintiffs' potential entitlement to the funds at issue. Specifically, the government argues that "the *only* thing 'restricted' by the statutory use restriction[s] is what the Secretary can do with the money appropriated – here, money appropriated in 1888, 1889, and 1890[,]" and that "[i]t is plainly impossible to violate such . . . restriction[s] once those funds have been expended." Def.'s Reply at 13-14. The court expressed some skepticism of that argument at the hearing held on the present motions, *see* Hr'g Tr. 30:10-30:19 (Oct. 22, 2010), and will now address the merits of the government's position in full.

"Every agency decision must be anchored in the language of one or more statutes the agency is charged to implement." 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE 155 (5th ed. 2010). This fundamental precept of administrative law — that an agency may only act pursuant to and within the scope of a statutory delegation of authority granted by Congress — is embodied in the Administrative Procedure Act and judicial review of congressional delegations of power to administrative agencies. *See* 5 U.S.C. §706(2)(c) (A "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see, e.g., Federal Commc'n Comm'n v. Fox Television Stations, Inc.*, __ U.S. __, __, 129 S.Ct. 1800, 1823 (2009) (Kennedy, J., concurring); *Whitman v. American Tucking Ass'ns.*, 531 U.S. 457, 472-73 (2001); *Mistretta v. United States*, 488 U.S. 361, 371-73 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Moreover, "[u]nder the Appropriations Clause of the Constitution, funds from the Treasury cannot be used for purposes other than those permitted by the appropriating statute." *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1133 (Fed. Cir. 2004) (citing *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) ("Money may be paid out [of the Federal Treasury] only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute.")); *see also Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of anything not thus previously sanctioned."). Of course, the funds at issue were derived from the 1886 lands, which were properly purchased with appropriated funds; nonetheless, this basic principle regarding the expenditure of appropriations reinforces the conclusion that the Secretary was required to deal with the monies in a way that comported with the original appropriating statute.

The 1974 opinion letter from the Solicitor's office at the Department, which "sets forth the most definitive statement of the Department's position as to the legal status of the 1886 lands[,]" *Wolfchild VI*, 559 F.3d at 1248, explicitly makes the point that the Department must comply with the statutory use restrictions on a continuing basis. *See* J.A. 00392-97 (Barnes 1974 Mem.). That letter began by stating the Department's long-standing interpretation that the Appropriations Acts' benefits, including the 1886 lands, were to extend only to the loyal Mdewakanton and their lineal descendants. *Id.* at 00392. Because the benefits of the Acts could only be enjoyed by eligible Mdewakanton, the letter noted the predicament that unassigned lands might remain "idle and unproductive of income which might be used for the benefit of the Indians," as they could not be assigned to individuals who did not qualify as lineal descendants. *Id.* at 00393. The letter then analyzed whether the Secretary might find some source of authority under which it could lease the lands to non-eligible individuals. *Id.* at 00394.

After determining that the 1886 lands could not be classified as "tribal lands" susceptible to leasing under 25 U.S.C. § 15, the letter looked to the Appropriations Acts as a possible source of the Secretary's leasing authority. J.A. 00395. As noted in the recitation of facts, the letter concluded that "[t]he lands are held in trust by the United States with the Secretary possessing a special power of appointment among members of a definite class." J.A. 00396. Relying on the determination that the Appropriations Acts conferred the powers of a trustee on the Secretary, the letter concluded that "the Secretary *in the exercise of powers of an ordinary trustee*, *in light of broad discretionary powers conferred by statute*, [and] in these unique circumstances may grant leasehold interests in the lands acquired under authority of the above-listed acts of Congress [the Appropriations Acts]." *Id.* at 00396 (emphasis added). The letter then recognized that because the Secretary was acting pursuant to authority conferred by the Appropriations Acts, the funds derived from the 1886 lands were equally subject to the restrictions contained in those statutes. It stated: "*Proceeds from the leases should be kept separate and may be expended for the benefit of the class* in such manner as the Secretary deems best consistent with his powers under the trust." J.A. 00397 (emphasis added).

In the 1978 letter from the Field Solicitor of the Department to the Area Director of the BIA, this understanding of the restrictions on the Secretary's power to lease the 1886 lands was reiterated. J.A. 00399-401 (Shulstad 1978 Letter). In that letter, the Field Solicitor repeated the conclusion set out in the 1974 memorandum that the 1886 lands "could be leased, under certain

specified circumstances, to non-Indians or to non-eligible Indians, *provided that fair rent payments are made in order to provide income for the benefit of eligible Mdewakantons*." J.A. 00400 (emphasis added); *see* J.A. 00401 ("The rental would have to be paid to the Bureau of Indian Affairs for the benefit of Mdewakanton Sioux.").

Thus, when the Secretary leased the 1886 lands to non-eligible individuals and obtained money as a result, he plainly did so under authority conferred by the Appropriations Acts. Because the Secretary acted in these endeavors pursuant to a congressional delegation of power granted in the Appropriations Acts, he was statutorily required to handle the funds derived from the 1886 lands in a manner that accorded with the congressional mandates contained in those Acts—including the requirements that the benefits of the Appropriations Acts be distributed to the loyal Mdewakanton and families thereof and that such benefits be conferred in as equal an amount as practicable. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."). The question remains, however, whether the requirements contained in the Appropriations Acts may be read as creating a money-mandating duty such that the Secretary's contravention of them may allow a damages remedy for the lineal descendants of the loyal Mdewakanton.

(a.) *Jurisdiction.*

The government challenges the court's jurisdiction, arguing that the Appropriations Acts and subsequent Department actions do not create the money-mandating duty that plaintiffs must establish as a basis for their claims under the Indian Tucker Act, 28 U.S.C. § 1505.[46] *See* Def.'s Mot. at 18-25. Plaintiffs assert that the Appropriations Acts created a money-mandating duty on the part of the government for the benefit of the 1886 Mdewakanton and their lineal descendants, and that the government is liable in damages for its disbursement of the funds to the three communities. *See* Pls.' Cross-Mot. at 26-29, 33-43.

The Indian Tucker Act was adopted in 1946 to avoid the need for Indians to present special jurisdictional bills to Congress. *See Mitchell II*, 463 U.S. at 214. Where the plaintiffs are a "tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska," the Indian Tucker Act provides the court with the same juridical power it would have respecting traditional Tucker Act claims. 28 U.S.C. § 1505. The

---

[46]As part of its argument that the court lacks subject matter jurisdiction, the government contends also that any claim plaintiffs may have in the funds derived from the 1886 lands was extinguished by the 1980 Act and that such a claim would be barred by the statute of limitations as well. Def.'s Mot. at 25-26; 30-35. In granting plaintiffs' motion to amend, the court concluded that the 1980 Act does not affect a wholesale termination of plaintiffs' interest in the funds and the statute of limitations has been tolled. *See supra*, at 26-31. The court's conclusion as to these issues in its motion-to-amend analysis dispenses with these same arguments as presented in the government's motion to dismiss. *But see infra*, at 49-50 (reaching the opposite conclusion respecting funds derived from the Wabasha Land Transfer). Accordingly, the court rejects the government's arguments on these points and will not repeat its reasoning here.

loyal Mdewakanton are an "identifiable group of American Indians" within the meaning of the Act, *see Wolfchild I*, 62 Fed. Cl. at 539-40,[47] and their claims are premised on laws of the United States, namely the Appropriations Acts. Thus, plaintiffs' claims fall within the terms of the Indian Tucker Act. As explained above, however, the source of law upon which plaintiffs rely must "be fairly interpreted or reasonably amenable to the interpretation that it mandates a right of recovery in damages." *Adair*, 497 F.3d at 1250 (quoting *White Mountain Apache*, 537 U.S. at 472-73) (internal quotations omitted).

"[W]here the statutory text leaves the government no discretion over payment of claimed funds[,]" Congress has provided a money-mandating source for jurisdiction in this court. *Samish*, 419 F.3d at 1364; *see Hopi Tribe*, 55 Fed. Cl. at 86-87. In this regard, the Federal Circuit has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Greenlee Cnty.*, 487 F.3d at 877 (quoting *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003)). "But Tucker Act jurisdiction is not limited to such narrow statutory entitlements[;] [c]ertain discretionary schemes also support claims within the Court of Federal Claims['] jurisdiction." *Samish*, 419 F.3d at 1364.

For example, the use of the word "may" in a statute leads to the presumption that the government has discretion over the payment of funds and does not owe a money-mandating duty to a plaintiff. *See Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006). Yet, "this presumption of discretion may be rebutted by 'the intent of Congress and other inferences that [the court] may rationally draw from the structure and purpose of the statute at hand.'" *Id.* (quoting *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed. Cir. 2002)); *see, e.g., Doe v. United States*, 100 F.3d 1576, 1579-82 (Fed. Cir. 1996) (concluding that moiety statute, 19 U.S.C. § 1619(a), which provided that the Secretary of Treasury "may award and pay" to an informant a reward, was money-mandating in light of legislative history and prior interpretation of statute). Thus, "a statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Doe*, 463 F.3d at 1324 (citing *Samish*, 419 F.3d at 1364-65); *see also District of Columbia v. United States*, 67 Fed. Cl. 292, 305 (2005) ("Even statutory language such as 'may award and pay' has been found to be money-mandating, when the legislative intent and context of the statute indicate that the applicant is entitled to payment from the United States if certain conditions have been met." (*citing Doe*, 100 F.3d at 1580-82)).

To determine whether the Appropriations Acts created a mandatory form of benefits for plaintiffs, the court must first look to the text of the Acts. *See Samish*, 419 F.3d at 1365 ("The objective in interpreting [a statute] is to give effect to congressional intent. To determine

---

[47]In *Wolfchild I*, the government argued that lineal descendants of the loyal Mdewakanton do not have a right to sue under the Indian Tucker Act because they are not a tribe or otherwise identifiable group. *See* 62 Fed. Cl. at 539. The court rejected this argument, noting that the 1886 census and the Department's own dealings with the lineal descendants demonstrated that the plaintiffs are an identifiable group. *See id.* The government does not resuscitate this objection to plaintiffs' claim in the motions currently before the court.

[c]ongressional intent the court begins with the language of the statutes at issue." (citations omitted)).  All of the Appropriations Acts provided that the money appropriated was "to be expended by the Secretary of the Interior."  25 Stat. at 229; 25 Stat. at 992; 26 Stat. at 349.  In this respect, Congress used the word "shall."  For example, the 1889 Act provided that the unspent funds "*shall* . . . be used and expended for the purposes for which the same amount was appropriated and for the benefit of the above-named Indians."  25 Stat. at 992 (emphasis added).  The 1889 and 1890 Acts provided "all of said money . . . *shall* be so expended that each of the [loyal Mdewakanton]. . . *shall* receive[]" an equal amount as practicable, and the 1889 Act made that provision applicable to the 1888 Act.  25 Stat. at 992-93; 26 Stat. at 349 (emphasis added).  Both Acts also stated that, as far as practicable, lands for the loyal Mdewakanton "*shall* be purchased in such locality as each Indian desires."  25 Stat. at 993; 26 Stat. at 349 (emphasis added).  The 1890 Act additionally provided that a certain sum of the money "*shall* be expended for the Prairie Island settlement."  26 Stat. at 349 (emphasis added).

The language of the Appropriations Acts exceeds the wholly discretionary language that may render a statute merely "money-authorizing," not "money-mandating."  *See, e.g., Perri v. United States*, 340 F.3d 1337, 1341 (Fed. Cir. 2003) (Section 524 of Title 28 is a "money-authorizing statute, not a money-mandating one" where the statute merely established the Department of Justice Assets Forfeiture Fund and dictated that funds for the payment of certain awards "shall be available to the Attorney General."); *Hopi Tribe*, 55 Fed. Cl. at 87-92 (concluding that a statutory provision was not money-mandating where the pertinent provision stated "[t]he Secretary of Interior was authorized" to pay the legal fees of certain tribes).  Consistent use of the word "shall" throughout the statute favors the finding that the Appropriations Acts are money-mandating.  *See, e.g., Doe*, 463 F.3d at 1325; *Greenlee Cnty.*, 487 F.3d at 877; *Agwiak*, 347 F.3d at 1380.

The pertinent historical antecedents to the Appropriations Acts also have an important bearing on whether they are money mandating.  *See Samish*, 419 F.3d at 1365 ("To fully understand the meaning of a statute . . . the court looks 'not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990))).  Notably, the Supreme Court's analytical position in *Quick Bear*, 210 U.S 50, serves as an appropriate guide in this respect.  In *Quick Bear*, the Supreme Court emphasized that when facing questions regarding appropriations to Indians, the inquiry is largely an historical one.  The Supreme Court addressed in *Quick Bear* the question of whether funds appropriated to fulfill treaty obligations and income on Indian trust funds could be expended for the support of sectarian schools on an Indian reservation in the face of a statute disallowing Congress from appropriating funds for education in sectarian schools.  *Id.* at 50-53.  The Court distinguished between gratuitous appropriations "relate[d] to public moneys belonging to the government" and "moneys which belong to the Indians and which is administered for them by the government."  *Id.* at 66.  Noting that these two classes of appropriations are "essentially different in character[,]" the Court stated that money appropriated pursuant to a treaty and listed under the heading of "Fulfilling Treaty Stipulations with, and Support of, Indian Tribes" "is not public money in this sense [but rather] [i]t is the Indians' money, or, at least, is dealt with by the government as if it belonged to them, as morally it does."  *Id.* at 80.  Similarly, "trust fund[s,] [which] ha[ve] been set aside for the Indians . . . and require[] no annual appropriation[,] [are] distributed in accordance with the discretion of the Secretary of

the Interior, but really belong to the Indians." *Id.* at 80-81.  Both types of funds, the Court concluded, are "moneys belonging really to the Indians [constituting] . . . the price of land ceded by the Indians to the government." *Id.* at 81.  Thus, they are "not gratuitous appropriations of public moneys, but the payment . . . of a treaty debt in instal[l]ments." *Id.*[48]

In this case, the historical antecedents to the Appropriations Acts are similarly informative to understanding the language used in the Acts.

(b.) *Purpose of the Appropriations Acts.*

To recapitulate the more detailed recitations in the statement of facts, the loyal Mdewakanton did not breach the 1851 and 1858 treaties that bound the Sioux to maintain peaceful relations with the settlers.  A breach by other Sioux of those treaties served as the fundamental predicate for Congress' voiding of the United States' treaties with the Sioux and terminating all annuities to them.  Congress did not except the loyal Mdewakanton from those measures, but, instead, afforded a different set of rights to the loyal Mdewakanton in the two 1863 Acts and subsequently, in the Appropriations Acts.  In every practical sense then, the appropriated funds constituted replacements for the annuities and other benefits the loyal Mdewakanton had received under prior treaties in exchange for their concession of land.  *See Quick Bear*, 210 U.S. at 80-81 (distinguishing "gratuitous appropriations of public moneys" from "the payment . . . of a treaty debt in installments [which are the] price of land ceded by the Indians to the government").

This interpretation is bolstered by the fact that all three of the Appropriations Acts were placed under the heading of "Fulfilling Treaty Stipulations with and Support of Indian Tribes," rather than the more general "Miscellaneous" or "Miscellaneous Supports" heading.  *See* 25 Stat. at 219; 25 Stat. at 982; 26 Stat. at 338; *see also Quick Bear*, 210 U.S. at 80 (noting that the funds the Court classified as the "Indians' money" and not "gratuitous appropriations" were listed under the heading of "Fulfilling Treaty Stipulations with, and Support of, Indian Tribes").  While the placement of the funds under that heading "does not support the contention that the Appropriations Acts constituted a conveyance of trust property." *Wolfchild VI*, 559 F.3d at 1240, it supports the fact that Congress regarded the Appropriations Acts as substitute payments for the annuities that would have been received under the Sioux treaties.

---

[48]*Quick Bear*'s distinction between "gratuitous appropriations" and money more properly characterized as "belong[ing] to" the Indians has continued to serve as a reference point for courts facing similar questions of the government's obligations in relation to Indian monies. *See, e.g., Lincoln*, 508 U.S. at 194-95 (citing *Quick Bear* as "distinguishing between money appropriated to fulfill treaty obligations, to which [a] trust relationship attaches, and 'gratuitous appropriations'"); *Sac and Fox Tribe of Indians of Okla. v. Apex Const. Co.*, 757 F.2d 221, 222-23 (10th Cir. 1985) (noting in *Quick Bear* that "[t]he Supreme Court recognized the distinction between tribal funds and public monies"); *Scholder v. United States*, 428 F.2d 1123, 1129 (9th Cir. 1970) (relying on *Quick Bear*'s distinction between "gratuitous appropriations" and "treaty or tribal funds"); *Samish Indian Nation v. United States*, 90 Fed. Cl. 122, 148 (2009) (citing *Quick Bear* as making a distinction between "gratuitous appropriations" and "moneys which belong to the Indians and which is administered for them by the government").

The legislative history of the Appropriations Acts also reveals that the Acts were viewed as a substitution for the treaty benefits of which the loyal Mdewakanton had been deprived. Senator MacDonald, the sponsor of the 1888 Appropriation, described his purpose in proposing the Act:

> [A] few of . . . [the Sioux] remained friendly to the whites and became their trusted allies and defenders, and . . . a number of them did valuable service in protecting our people and their property, and in saving many lives . . . . They have ever since had claims upon not only our gratitude but that of the nation at large, which ought long ago to have been recognized and partially, at least, compensated for their invaluable services . . . I am almost ashamed to say it, but the fact is that no exception [to the Act of Feb. 16, 1863] was made, even in favor of these friendly Indians.

19 Cong. Rec. 2,976-77 (1888).  In the course of passing the 1890 Act, Senator Davis similarly stated:

> When the [1868] treaty was made it was made with the Indian nation that was at war with the United States, and not with [the loyal Mdewakanton] . . . and by reason of which severance all rights had fallen, so that they had no rights and interests in this country, and they were confiscated in common with all the annuities of the hostiles, and that worked a great injustice for which they have never been repaid.

21 Cong. Rec. 7,589 (1890).[49]

---

[49]In debating the terms of the 1890 Act, Senator Davis summarized the circumstances that generated the Appropriations Acts:

> Now, in regard to the act of February, 1863, what was it? The whole frontier of Minnesota had been swept with fire and massacre.  The situation in that part of the country was not then fully understood and it was not known here to its full extent, nor was the extent of the service which these people had performed toward the Government fully known . . . [W]hen the law of 1863 was passed Congress did not stop to consider what the relations of this fragment of the band of Medawakantons had been to the white people; and accordingly, without discrimination, without any saving of rights, Congress annulled all the rights of all the Medawakantons to their share of annuity moneys. There was an instance where, if the relations of those people had been adequately known at that time, those rights would have been preserved.  That they were not preserved is due partly to the effect of insufficient knowledge on the subject, but more largely to the fact that there was a spirit abroad then which demanded confiscation and annulment of all Indian rights of property.

21 Cong. Rec. 7,590-91.

43

Additionally, the Department's own implementation of the Acts and its treatment of the funds at issue is persuasive in ascertaining the purpose of the Appropriations Acts.  *See Mead*, 533 U.S. at 227 ("[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (internal quotations omitted))). With the exception of its unsupported decision to disburse the funds pursuant to the 1980 Act, *see* J.A. 00878-80 (Nitzschke 1981 Letter), time and again the Department reiterated its opinion that the appropriated funds, land, and leasing funds at issue were being held for the benefit of eligible Mdewakanton only.  *See, e.g.*, J.A. 00397 (Barnes 1974 Mem.) ("Proceeds from the leases should be kept separate and may be expended for the benefit of the class."); J.A. 02548 (Area Director's 1975 Mem.) (concluding that the funds derived from the 1886 lands could not be distributed to the three communities because "the funds appropriated are to be used only for the benefit of a certain class of people identified by special census of that time [the 1886 Mdewakanton]."); J.A. 01115-16 (Area Director's 1976 Mem.) (reiterating that only lineal descendants of loyal Mdewakanton were entitled to the funds derived from the 1886 lands); J.A. 00400 (Shulstad 1978 Letter) ("[F]air rent payments [must be] made in order to provide income for the benefit of eligible Mdewakantons.").  These recitations were found in reasoned opinions that demonstrate the type of careful deliberation that can guide the court in determining the persuasive weight that should be accorded to agency interpretations of statutes.  *See Cathedral Candle Co.,* 400 F.3d at 1366.

In sum, Congress' purpose in passing the Appropriations Acts reveals that the provisions in the Acts are not merely "money-authorizing" legislation, as the government argues.  Rather, Congress intended the Appropriations Acts to serve as substitutes for the obligations the government took upon itself in its prior treaties with the Sioux in consideration of the conveyance of Sioux rights to land and resources.  Congress likewise intended that the restrictions in Acts, including the provision that the funds be expended only for the benefit of the loyal Mdewakanton, serve as binding obligations on the part of the Secretary.[50]  For ninety years, the Department recognized this obligation and treated the funds as belonging to eligible Mdewakanton, including the lineal descendants, by collecting income from rents and licenses from non-eligible lessees and licensees of the 1886 lands and holding such monies separately in trust accounts for the benefit of the Mdewakanton.  The Department's administration of the monies obtained from the 1886 lands distinguishes them from "gratuitous appropriations," and aligns the monies with funds "which belong to the Indians and *which [are] administered for them by the government*."  *Quick Bear*, 210 U.S. at 77 (emphasis added).  In sum, the factual

---

[50]As noted, Congress was aware at the time of the passage of the Acts that the Sioux had entered new treaties with the government under which they were provided with land and annuities, while the loyal Mdewakanton, who had severed tribal relations, were left destitute. *See supra* at 43 & n.49 (quoting statements of Sen. Davis).  The Appropriations Acts sought to compensate the latter group.  Allowing the Secretary to distribute the funds to the three communities in lieu of the lineal descendants of the loyal Mdewakanton would defeat Congress' intent to provide for the loyal Mdewakanton and their families, who suffered precisely because they lacked tribal relations.  *See Hopi Tribe*, 55 Fed. Cl. at 91 (considering whether interpreting the Navajo-Hopi Settlement Act of 1974 as failing to give rise to a money-mandating duty would "interfere with or defeat congressional intent").

record illustrates that the funds at issue were "dealt with by the government as if it belonged to" the loyal Mdewakanton, "as morally it does." *Id.* at 80.

(c.) *Structure of the Appropriations Acts.*

Despite the differences between the three statutes, collectively the Appropriation Acts essentially contained five defining elements. First, each of the Acts stated that the appropriated funds were "to be expended" by the Secretary, and, at all other points, the Acts provided that the Secretary "shall" expend the funds according to the various restrictions set out in them. Although this language did not definitively render the Appropriations Acts money-mandating, the obligatory language used throughout the Acts favors finding that a money-mandating duty was created as a result of the Acts.

Second, the Appropriations Acts also all included the mandate that the money be spent for the benefit of a particular and identifiable class of beneficiaries — the loyal Mdewakanton. *See* 25 Stat. at 228-29; 25 Stat. at 992-93; 26 Stat. at 349; *Wolfchild VI*, 559 F.3d at 1243 (In granting land assignments to the loyal Mdewakanton and their lineal descendants, "the Secretary held the property for the use and benefit of individuals selected from *a defined class*.") (emphasis added). As the Federal Circuit recognized, "Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts." *Wolfchild VI*, 559 F.3d at 1243; *id.* ("The Secretary of the Interior considered himself bound by the terms of the statutes to reserve the usage of the 1886 lands for members of the particular beneficiary class (the 264 individuals determined by a contemporaneous Interior Department census to constitute the 1886 Mdewakantons)."). Because the Acts were intended to compensate the loyal Mdewakanton for the deprivation of their annuities and land under the first 1863 Act, they fit within the general characterization of money-mandating statutes as those that seek to "compensate a particular class of persons for past injuries or labors." *Bowen v. Massachusetts*, 487 U.S. 879, 907 n.42 (1988); *see also Black v. United States*, 56 Fed. Cl. 19, 22 (2003) (For a statute to be money-mandating, it must "compensate a particular class of persons for past injuries or labors."); *Kennedy Heights Apartm ents, Ltd. I v. United States*, 48 Fed. Cl. 574, 579 (2001) ("In order to be found money-mandating, a statute must 'compensate a particular class of persons for past injuries or labors.'" (quoting *Bowen*, 487 U.S. at 907 n.42)).

Third, the Appropriations Acts also included detailed directions requiring the Secretary to put the funds to particular uses, including purchases of agricultural stock and equipment and land. *See* 25 Stat. at 228-29; 25 Stat. at 992-93; 26 Stat. at 349. Fourth, the Acts required that the Secretary expend the money in a way that ensured each loyal Mdewakanton would receive as close to an equal amount as practicable. *Id.* Fifth, the Acts contained no time restrictions on the expenditure of the funds, and, in fact, the 1888 and 1889 Acts were both subject to the provision that any money appropriated not expended within the applicable fiscal year would be carried over to the following years and expended for the benefit of the loyal Mdewakanton. *Id.* These requirements that the funds be expended for particular uses and for a narrowly defined class of beneficiaries distinguish the Acts from lump-sum appropriations, the expenditure of which is committed to agency discretion. *See Samish*, 419 F.3d at 1366 (noting that the Supreme Court, in *Lincoln*, 508 U.S. 182, determined that "the Snyder Act[, 25 U.S.C. §§ 2, 13,] does not provide a damage remedy because it does not require the expenditure of general appropriations,

on specific programs, for particular classes of Native Americans"); *Samish*, 90 Fed. Cl. at 139-40, 146-47 (concluding that various annual lump-sum appropriations to the Department of Interior that did not specify to whom or for what specific purposes the funds should be paid were not money-mandating).

(d).  *The lineal descendants' entitlement.*

Nonetheless, under the government's view, whatever restrictions are contained in the Appropriations Acts cannot be read to benefit the lineal descendants of the loyal Mdewakanton. *See* Def.'s Opp'n at 12-13.  This is so, the government argues, because "Congress did not include lineal descendants as a beneficiary of the acts and its use of the word 'family' did not create any vested ownership rights in the purchased land." *Id.* at 12 (citing *Wolfchild VI*, 559 F.3d at 1242). In regards to the inclusion of the loyal Mdewakantons' "family" or "families" as beneficiaries under the Appropriations Acts, the Federal Circuit concluded that "the references to the Mdewakantons' families was not directed at creating rights of inheritance in the properties purchased, but instead was simply part of the directive to the Secretary as to the scope of his discretion in spending the appropriated funds." *Wolfchild VI*, 559 F.3d at 1242.  While the language "makes clear that the authorization for expenditures extended to cover the needs of the families of the beneficiaries, not simply the needs of the beneficiaries themselves, [i]t does not speak to the nature of the interest created in any real property purchased with the funds." *Id.* Contrary to the government's argument, the Federal Circuit's conclusion that the lineal descendants did not obtain an inheritable property interest in the 1886 lands does not answer the question of whether the Secretary violated a money-mandating duty by distributing the funds derived from those lands to groups of individuals not intended to qualify as beneficiaries of the Appropriations Acts to the prejudice of the individuals who would have qualified as beneficiaries.

The Appropriations Acts authorized the Secretary to expend the funds for the benefit of two classes of individuals: the loyal Mdewakanton and families of the loyal Mdewakanton.  *See* 25 Stat. at 992-93; 26 Stat. at 349.[51]  Contemporaneous sources demonstrate that at the time the Appropriations Acts were passed, the term "family" was understood to have both narrow and broad meanings.  In the narrowest sense, a "family" was understood to include "a father, mother, and children."  BLACK'S LAW DICTIONARY 477 (1891) ("BLACK'S"); BOUVIER, A LAW DICTIONARY 645 (15th ed. 1883) ("BOUVIER") ("Family" encompasses "[f]ather, mother, and children.").  "Family" was also understood to include "all the relations who descend from a common ancestor, or who spring from a common root."  BLACK'S 477; *see also* BOUVIER 645 ("Family" means "[a]ll the relations who descend from a common ancestor or who spring from a common root."); 5 OXFORD ENGLISH DICTIONARY 707 (2d. ed. 1989) (citing contemporaneous examples of usage and defining "family" as including "[t]hose descended or claiming descent

---

[51]The 1888 Appropriation did not include the provision that the funds were to be expended for the families of the loyal Mdewakanton.  *See* 25 Stat. at 228-29.  Because the appropriated funds were ultimately utilized in the same assignment system and the Department did not distinguish between the 1888 Appropriation and the subsequent Acts in its legal opinions or in its administration of the funds, the court will not treat the funds traceable to the 1888 Appropriation differently.

from a common ancestor: a house, kindred, lineage" and "a people or group of peoples assumed to be descended from a common stock"). The legislative history does not reveal whether Congress contemplated the narrow or broad understanding of "family" when it passed the Appropriations Acts. Interpretive guidance, however, can be derived from the Federal Circuit's opinion and from the Department's interpretations of the Acts.

In describing the Secretary's decision to assign lands to lineal descendants of the loyal Mdewakanton, the Federal Circuit stated:

> The Interior Department recognized, of course, that Congress intended the 1886 Mdewakantons to be the specific beneficiaries of the Appropriations Acts. The Secretary of the Interior accordingly sought to ensure that the funds appropriated under the Act would be spent for those individuals. With respect to funds that were used to purchase land (as opposed to personal property that was rapidly consumed), *the Secretary adopted a policy designed to promote Congress's intent by assigning the land to individuals from within the group of 1886 Mdewakantons and subsequently to individuals from within the class of the descendants of those Mdewakantons.*

559 F.3d at 1243 (emphasis added). Thus, under the Federal Circuit's interpretation of the Appropriations Acts, the Secretary was "promot[ing] Congress's intent by assigning the land to" lineal descendants of the loyal Mdewakanton. *Id.*

The Department's consistent practice over a ninety-year period of granting land assignments to lineal descendants and numerous internal memoranda of the Department reinforce this view. A 1933 memorandum from the Assistant Solicitor made the point when it stated: "Under present law, the land which is the basis of these communities was land purchased for the Mdewakanton Sioux residing in Minnesota on May 20, 1886 *and their descendants. It has been and can be assigned only to such persons.*" J.A. 00587-88. (Mem. from Charlotte T. Westwood to Joe Jennings, Indian Reorganization (Undated, written sometime after Nov. 27, 1933)) (emphasis added). A 1950 memorandum prepared by the Area Land Officer for the Department once again stated the Department's interpretation of the lineal descendants' entitlement to the 1886 lands. *See* J.A. 00373-74 (Mem. by Rex. H. Barnes (July 24, 1950)) ("Barnes 1950 Mem."). That opinion stated that:

> In view of the provisions of the [Appropriations] Acts . . . [the 1886 lands] may be assigned only to members of the Mdewakanton Band of Sioux Indians residing in Minnesota, and such assignee must have been a resident of Minnesota on May 20, 1886, or be a legal descen[d]ant of such resident Indian.

J.A. 00374. In a 1969 memorandum from the Area Director of the BIA in Minneapolis to the Field Solicitor, the 1950 memorandum's interpretation of the Appropriations Acts was researched and endorsed once more. J.A. 00382 (Mem. from Daniel S. Boos (Mar. 17, 1969)) ("Based on independent research I have concluded that these remarks [the statements in the Barnes 1950 memorandum regarding the lineal descendants' entitlement] are correct.").

A 1970 memorandum from the Assistant Solicitor for Indian Legal Activities reiterated the Department's interpretation of the Appropriations Acts.  J.A. 00386-87 (Mem. from Charles M. Soller to the Field Solicitor, Minneapolis, Minn. (Dec. 4, 1970)) ("Soller 1970 Mem.").  That memorandum stressed:

> [T]he land in question remains available only for the use of qualified Mdewakanton Sioux Indians.  If it appears desirable to use the land by assigning it to or for the benefit or other Indians, we suggest that Congress should be asked to permit such action by affirmative legislation.  We know of no means of accomplishing this by administrative action, particularly over any objections of eligible Mdewakanton Sioux Indians.

J.A. 00386.

A 1971 memorandum from the Acting Associate Solicitor of Indian Affairs restated the Department's interpretation that the Appropriations Acts entitled lineal descendants of the loyal Mdewakanton to its benefits.  J.A. 00344-49 (Mem. from William A. Gersbury to the Field Solicitor for the Department, Twin Cities, Minn. (Aug. 19, 1971)) ("Gersbury 1971 Mem.").  In response to the Field Solicitor's inquiry as to the Shakopee Mdewakanton Sioux Community's potential entitlement to the 1886 lands, the opinion cited the text of the Appropriations Acts that stated that the appropriated funds were for the benefit of the loyal Mdewakanton.  J.A. 00344.  It followed the citation by stating that "*only descendants of Mdewakantons who resided in Minnesota on May, 20, 1886, are eligible for land assignments at Shakopee*." *Id.*  (emphasis added).  Later, the memorandum reiterated that, as of 1971, lineal descendants were the only group entitled to the 1886 lands:

> [A]ny assignee who cannot meet the basic requirement for issuance of an assignment (that he is a legal descendant of a Mdewakanton  Sioux resident of Minnesota on May 20, 1886) has no right to continued possession of the property, even if, the assignment was presumably valid when issued.  *The wording in the aforementioned Acts of Congress* [the Appropriations Acts] *compels us to this conclusion*.

J.A. 00347 (emphasis added) (internal parenthetical included in original).  The letter ended by repeating the conclusion in the Soller 1970 memorandum that congressional action would be required to allow anyone other than lineal descendants of the loyal Mdewakanton to benefit from the land.  J.A. 00348-49.

The lineal descendants' entitlement to the benefits of the Appropriations Acts was stated once again in a 1978 letter from the Field Solicitor to the Area Director of the BIA.  J.A. 00399-00401 (Shulstad 1978 Letter).  That letter noted that "[t]he land is held for the benefit of a specific class of people and their descendants."  J.A. 00400.

The above memoranda, particularly the detailed analysis contained in the Gersbury 1971 memorandum, manifestly demonstrates that the Department did not view

its assignment of lands to the lineal descendants as a matter of administrative grace; rather, it considered itself "compel[led]" by the terms of the Appropriations Acts to do so. J.A. 00347 (Gersbury 1971 Mem.).  In light of the Department's decades-long interpretation that the Acts' benefits, including the leasing funds, extended to lineal descendants and only lineal descendants of the loyal Mdewakanton, the government's argument that "the Appropriations Acts cannot be interpreted as creating any duties as to the descendants of the loyal Mdewakanton" carries little or no persuasive weight. Although the Appropriations Acts do not specify how broadly "family" was to be interpreted, in light of the aforementioned facts, the court is persuaded that inclusion of the term "family" and "families" encompassed "lineal descendants" of the loyal Mdewakanton, such that plaintiffs may base their claims on the statutory use restrictions contained in the Appropriations Acts.[52]

(e.) *The Secretary's discretion.*

The government also argues that "[i]nsofar Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to the loyal Mdewakanton, the Secretary's distribution [of funds from the Treasury accounts] was permissible and the [c]ourt lacks jurisdiction to otherwise review his decision."  Def.'s Mot. at 29 (*citing Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002)).  For this proposition, the government relies on the fact that the Acts granted the Secretary the discretion to implement the Acts' mandates "in such manner as in his judgment he may deem best."  *Id.*  Besides this general argument, the government particularly avers that "[t]o the extent the funds in the account were traceable to the Wabasha land transfer[,] the Secretary's distribution was permissible because such distribution was left to his discretion and [p]laintiffs have no vested or beneficial interest in the funds."  *Id.*  The court will first address the government's specific argument regarding the Wabasha-Land-Transfer funds.

The 1944 Act authorizing the transfer of the 1886 Wabasha lands to the Upper Mississippi River Wild Life and Fish Refuge provided that:

The sum of $1,261.20 . . . is hereby made available for transfer on the books of the Treasury . . . to the credit of the Medawakanton and Wahpakoota Bands of Sioux . . . and shall be subject to disbursement under the direction of the Secretary

---

[52]The court's conclusion is bolstered by the long-standing canon of statutory interpretation that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see Bryan v. Itasca Cnty., Minn.*, 426 U.S. 373, 392 (1976) ("[I]n construing . . . admittedly ambiguous statute[s]. . . [the court] must be guided by that eminently sound and vital canon . . .  that statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.") (internal quotations and citations omitted); *Shoshone*, 364 F.3d at 1352 (noting that the principle articulated in *Blackfeet* supported the court's interpretation that the government was obligated under 25 U.S.C. § 612 to credit prejudgment interest to plaintiffs); *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1314 (Fed. Cir. 2000) (noting the *Blackfeet* principle).

of the Interior for the benefit of the Medawakanton and Wahpakoota Bands of Sioux Indians. Where groups of such Indians are organized as tribes under the [Reorganization Act], the Secretary of the Interior may set apart and disburse for their benefit and upon their request a proportionate part of said sum, based on the number of Indians so organized.

1944 Act, § 2, 58 Stat. 274. Subsequently, $1,261.20 was transferred to Treasury account 147436 "Proceeds of Labor, the Mdewakanton and Wahpakoota Bands of Sioux Indians." Def.'s Mot. at 8. That money was later distributed to the three communities when the Department disbursed the entirety of the funds derived from the 1886 lands. *Id.* at 10-11.

Under the terms of the 1944 Act, payment was made not to the loyal Mdewakanton or their descendants, *see Wolfchild VI*, 559 F.3d at 1251; rather, the funds were allocated to be paid for the benefit of the Mdewakanton and Wahpakoota Bands generally. Plaintiffs' entitlement to the funds derived from the 1886 lands in Wabasha, which would have been based on the restrictions contained in the Appropriations Acts, was consequently terminated upon passage of the 1944 Act. *See id.*, 559 F.3d at 1257-58 (noting that Congress had the power to change the identity of the class of individuals entitled to the 1886 lands). Additionally, when the Secretary distributed the Wabasha-Land-Transfer funds to the three communities, he acted pursuant to authority derived from the 1944 Act, which explicitly allowed him to disburse the funds to tribes organized under the Reorganization Act. *See* 1944 Act, §2, 58 Stat. 274.

Accordingly, although the rest of the funds at issue remained controlled by the terms of the Appropriations Acts and unaffected by the 1980 Act, the 1944 Act provided that the Wabasha-Land-Transfer funds be paid to a broader set of beneficiaries and conferred upon the Secretary supplemental authority to distribute those funds, thus freeing the disbursement of the Wabasha funds from the statutory restrictions of the Appropriations Acts. Consequently, the government's motion to dismiss as to these specific funds is granted.

Respecting the Secretary's discretion as to the remaining pre-1980 funds, the Appropriations Acts provided that the Secretary could use his "judgment" in administering the benefits of the Appropriations Acts. *See* 25 Stat. at 228-29 ("For the support of [eligible Mdewakanton] . . . twenty thousand dollars, to be expended by the Secretary of the Interior in the purchase, in such manner as in his judgment he may deem best, of agricultural implements, cattle, horses and lands"); 25 Stat. at 992-93 ("For the support of [eligible Mdewakanton] . . . twelve thousand dollars, to be expended by the Secretary of the Interior as follows: ten thousand dollars in the purchase, as in his judgment he may think best, of such lands, agricultural implements, seeds, cattle, horses, food or clothing as may be deemed best in the case of each [eligible Mdewakanton] or family thereof."); 26 Stat. at 349 ("For the support of [eligible Mdewakanton] . . . eight thousand dollars, to be expended by the Secretary of the Interior, as in his judgment he may think best, for such lands, agricultural implements, buildings, seeds, cattle, horses, food, or clothing as may be deemed best in the case of each [eligible Mdewakanton] or families thereof.").

The clause granting discretion to the Secretary did not modify or abrogate the Appropriations Acts' other restrictions but rather simply allowed the Secretary to determine in

what precise manner to implement the acts.  That grant of restricted discretion can hardly be read to have provided the Secretary with the authority to override the specific mandates contained in the Acts.  As the Federal Circuit noted, "[t]he language of the Appropriations Acts . . . makes clear that the references to the Mdewakantons' families[,]" while not creating rights of inheritance in the 1886 lands, constituted "*part of the directive to the Secretary as to the scope of his discretion in spending the appropriated funds*."  *Wolfchild VI*, 559 F.3d at 1242 (emphasis added).  And as the extensive memoranda cited above demonstrate, the government's current interpretation directly contradicts the Department's long-standing position that the Department was statutorily bound to administer the funds for the benefit of the loyal Mdewakanton and their lineal descendants.  *See also Wolfchild VI*, 559 F.3d at 1248 ("To be sure, the Interior Department has consistently recognized that in the original legislation Congress intended for the appropriated funds to be expended for the benefit of the 1886 Mdewakantons.").

The government's interpretation of the breadth of the Secretary's discretion would render meaningless the provisions of the Appropriations Acts dictating that the funds were to benefit the eligible Mdewakanton only and that the funds were to be distributed as equally as possible.  Such an interpretation would contravene the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)); *see Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (courts must "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."); *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute."); *Shoshone*, 364 F.3d at 1349 ("Accepted rules of statutory construction suggest that we should attribute meaning to all of the words in [a statute] if possible." (citation omitted)); *Splane v. West*, 216 F.3d 1058, 1068 (Fed. Cir. 2000) ("We must construe a statute, if at all possible, to give effect and meaning to all its terms." (citation omitted)).  In this instance, the court need not strain to interpret the Appropriations Acts in a way that gives legal effect to all its terms.  The terms of the Acts make explicit that although Congress provided discretion to the Secretary to determine what particular items to purchase for beneficiaries of the Acts, depending on what he "deemed best" in each case, the Acts did not provide the Secretary with such broad discretion so as to negate the specific statutory restrictions.

The government's citation to *Milk Train*, 310 F.3d 747, provides no added support for its position.  In that case, Secretary of Agriculture had placed a 26,000 [hundredweight ("cwt")] per dairy operation cap on what could be considered "eligible production" for purposes of determining how much money a producer could receive in subsidies created for the Department to administer pursuant to its 2000 Appropriations Act, Pub. L. No. 106-78, § 805, 113 Stat. 1135, 1179 (1999).  *See* 310 F.3d at 748-49.  The 2000 Appropriations Act provided that the appropriated funds were to be used "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary."  *Id.* at 751.  The D.C. Circuit concluded that the district court lacked jurisdiction to review the plaintiffs' challenge to the cap because "Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers."  *Id.*  In so finding, the court noted that the statute

provided "no relevant statutory reference point for the court other than the decisionmaker's own views of what is an appropriate manner of distribution to compensate for 1999 losses." *Id.* (citation and internal quotation omitted).

This is not, however, a case where the court lacks any "meaningful standard[s] against which to judge the agency's exercise of discretion." *Milk Train*, 310 F.3d at 751 (quoting *Lincoln*, 508 U.S. at 191). To the contrary, the Acts provide quite straightforward standards by which to judge the Secretary's conduct. While the Secretary was entitled to exercise discretion as to the exact manner of implementation, he was at all times bound by the explicit mandates that the Acts' benefits extend to eligible Mdewakanton only and that they be distributed in as equal amounts as practicable.[53] Accordingly, the Secretary was empowered and required to distribute the funds to the group of statutorily authorized beneficiaries under the Acts — the lineal descendants of the loyal Mdewakanton.

Fairly interpreted, in light of the historical record and ninety years of the Department's own legal opinions and actions, the Appropriations Acts are reasonably amenable to the reading that they created a money-mandating duty on the part of the government to the lineal descendants of the loyal Mdewakanton.[54] Although the Secretary had significant discretion under the Appropriations Acts, in disbursing the leasing funds at issue, he was statutorily mandated to provide those funds to the lineal descendants of the loyal Mdewakanton. Plaintiffs fall within the class of plaintiffs entitled to recover under the Appropriations Acts as they are lineal descendants of the 1886 Mdewakanton.[55] The court thus has subject matter jurisdiction over plaintiffs' claims; the government's motion to dismiss on this ground is accordingly denied.

---

[53]The decision in *Milk Train* would be a more instructive precedent if, for example, the court there had been reviewing the Secretary's decision to distribute the appropriated funds to grain producers, as opposed to dairy producers, in the face of statutory language mandating that the appropriated funds were to be used for the assistance of dairy producers.

[54]The government argues that because the Acts do not provide a certain sum of money be paid to the loyal Mdewakanton, the Acts cannot be reasonably interpreted as giving rise to a money-mandating duty. However, a statute can be money-mandating without stating a precise amount to be paid. *See Doe*, 463 F.3d at 1324 ("[A] statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal *one of the following*: (1) the statute has 'clear standards for paying' money to recipients, (2) that statute specifies 'precise amounts' to be paid, *or* (3) the statute compels payment once certain conditions precedent are met.") (emphasis added). As described above, the Acts contain "clear standards for paying" the money to the lineal descendants of the loyal Mdewakanton.

[55]Plaintiffs and various intervening plaintiffs have submitted to the court thousands of pages of genealogical records demonstrating that most are lineal descendants of loyal Mdewakanton. *See* Pls.' Genealogy Affs., *e.g.,* Loretta Stensland Family Tree (establishing that numerous plaintiffs are lineal descendants of Mary Pay Pay (Pepe)); J.A. 00242 (May 20, 1886 census) (listing Mary Pepe as a loyal Mdewakanton).

Because plaintiffs assert that they were displaced from receiving any portion of the funds derived from the 1886 lands as a result of the Secretary's distribution of the funds to the three communities, their particular claims fall within the scope of the Appropriations Acts and likewise survive the government's motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Adair*, 497 F.3d at 1251.

      2.  *Money obtained from the 1886 lands after adoption of the 1980 Act.*

      Plaintiffs argue that "[a]fter the 1980 Act, under the [s]tatutory [u]se [r]estriction[s], the Department of the Interior should have continued to collect revenues from . . . [the three communities'] enterprises and leases" for eventual disbursement to the lineal descendants. Sixth Am. Compl. ¶ 83.  In support of this proposition, plaintiffs also rely upon the Reorganization Act, 48 Stat. 984, and the Indian Gaming Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988).  Sixth Am. Compl. ¶¶ 74, 88-98.  The government responds that the 1980 Act terminated any interest plaintiffs would have had in such funds and that neither the Reorganization Act nor the Indian Gaming Act provides additional support for plaintiffs' claim.  Def.'s Reply at 18-19; Def.'s Mot. at 25-26.[56]

      The 1980 Act did not terminate plaintiffs' entitlement to funds collected prior to the passage of the Act because the terms of the 1980 legislation dealt only with the 1886 lands, and because such funds were collected and disbursed pursuant to authority derived by the Secretary from the Appropriations Acts.  However, after the passage of the 1980 Act, the 1886 lands were and are now held by the United States in trust for the three communities.  *See Wolfchild VI*, 559 F.3d at 1255.  Consequently, the three communities, not the plaintiffs, would be entitled to any income derived from those lands because the communities have become the trust beneficiaries. *See, e.g.,* 1 George Gleason Bogert, George Taylor Bogert, and Amy Morris Hess, The Law of Trusts and Trustees § 1, at 11 (3d ed. 2000) ("A trustee holds trust property 'for the benefit of' the beneficiary.  Advantages usually come to the beneficiary. . . .  How the benefits are to come to the beneficiary is unimportant.  The important trust concept is the beneficiary's right to obtain them.").  Although the 1980 Act did not did not affect a blanket repeal of the Appropriations Acts, *see Wolfchild VI*, 559 F.3d at 1258 n.13, the 1980 Act's "long-term disposition of the property purchased pursuant to the Appropriations Acts," *id.*, renders the statutory use restrictions contained in the Appropriations Acts inapplicable to any funds derived from those lands after such conversion was had.  The government could not both abide by the mandate that only eligible Mdewakanton receive the Acts' benefits and perform its duties as trustee for the three communities by ensuring that the beneficiaries receive the benefits of the trust corpus.  Thus, while funds derived prior to 1980 remain subject to the terms of the Appropriations Acts, the terms of the 1980 Act prevent the application of the statutory use

---

[56]The government responds by arguing also that neither the Indian Gaming Act nor the Reorganization Act are independently money-mandating statutes.  *See* Def.'s Reply at 7-11.  The court does not read plaintiffs' complaint to assert that either statute independently gives rise to a money-mandating duty to the lineal descendants; rather plaintiffs argue that the statutory use restrictions contained in the Appropriations Acts should have controlled the government's administration of those statutes.  *See* Sixth Am. Compl. ¶ 73-98.

restrictions to the 1886 lands and funds derived from those lands subsequent to the passage of the 1980 Act.

Nonetheless, plaintiffs argue that the Reorganization Act "made the Secretary of the Interior's duties perpetual until Congress directed otherwise." Sixth Am. Compl. ¶ 74. Specifically, plaintiffs argue that the restrictions contained in the Appropriations Acts were extended by the Reorganization Act by virtue of the following provision: "The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are extended and continued until otherwise directed by Congress." 25 U.S.C. § 462 (quoted at Sixth Am. Compl. ¶ 74). The historical note to Section 462 indicates that the Section was applicable "to all Indian tribes, all lands held in trust by the United States for Indians, and all lands owned by Indians that are subject to a restriction imposed by the United States on alienation of the rights of Indians in the lands." The government asserts that 25 U.S.C. § 462 is consequently inapplicable to the 1886 lands because such lands were neither held in trust nor was title held by the assignees in restricted fee. *See* Def.'s Reply at 8-9.

The Federal Circuit definitively held that the 1886 lands were not held in trust by the United States and that the eligible Mdewakanton did not hold title to the land. *See Wolfchild VI*, 559 F.3d at 1255 ("[W]e conclude that, as of the time of the 1980 Act, all indications were that neither Congress nor the Department of the Interior had conveyed any vested ownership rights in the 1886 lands, legal or equitable, to anyone."). Accordingly, 25 U.S.C. § 462 does not apply to the 1886 lands. What is more, however, 25 U.S.C. § 462 provides that the periods of trust or restriction on alienation extend "until otherwise directed by Congress." As noted, Congress disposed of any interest plaintiffs had in the 1886 lands by adopting the 1980 Act, thus explicitly excluding the 1886 lands from the scope of 25 U.S.C. § 462.

Likewise, the Indian Gaming Act does not salvage plaintiffs' claim as to funds, including gaming revenue, derived from the 1886 lands after the passage of the 1980 Act. Plaintiffs argue that the Department's administration of the Indian Gaming Act was subject to the restrictions contained in the Appropriations Acts. They also contend that in approving tribal ordinances, revenue allocation plans, constitutions, and other documents pertinent to tribal gaming under the Indian Gaming Act that did not "provide [that] distributions of revenue from economic enterprises created as a result of the [Indian Gaming Act] [would] exclusively and equally benefit [all] the . . . 1886 Mdewakanton lineal descendants," the government contravened those restrictions. Sixth Am. Compl. ¶ 97. The Indian Gaming Act was adopted on October 17, 1988, 102 Stat. 2467; hence, any governmental approval of the three communities' tribal or gaming documents occurred after the passage of the 1980 Act. As noted, the 1980 Act rendered the restrictions contained in the Appropriations Acts inapplicable to the 1886 lands or to any funds derived from those lands subsequent to the passage of the 1980 Act. Thus, even if, in the absence of the 1980 Act, the government would have been theoretically bound to abide by the restrictions in its approval of the aforementioned documents, the 1980 Act eliminated those potential constraints on the government's actions.[57]

---

[57]In ruling that the 1980 Act terminated any potential support for plaintiffs' claims that may have been found in the Indian Gaming Act and the Reorganization Act, the court does not mean to indicate that plaintiffs' claims would have been viable but for the 1980 Act. Because

Accordingly, the government's motion to dismiss for lack of subject matter jurisdiction is granted respecting plaintiffs' claims that they are entitled to funds, gaming and otherwise, traceable to the 1886 lands after the passage of the 1980 Act.

3.   *The method of identifying lineal descendants for purposes of the Appropriations Acts.*

Plaintiffs claim that the manner in which the government determined who constituted lineal descendants of the loyal Mdewakanton "result[ed] in the exclusion of certain 1886 Mdewakanton lineal descendants from the distribution of revenue" derived from the 1886 lands. Sixth Am. Compl. ¶ 104.  As detailed in the recitation of facts, the Appropriations Acts defined its beneficiary class in terms of presence in Minnesota as of May 20, 1886, which in turn was determined by the McLeod and Henton listings (the 1886 census).  The historical record before the court indicates that the Department followed the Acts' mandates in preparing the listings and granting land assignments to individuals listed on the 1886 census and their lineal descendants. *See Wolfchild I*, 62 Fed. Cl. at 529 (describing the Department's land assignment system).

Whether this manner of ascertaining the lineal descendants resulted in the exclusion of some individuals who may have otherwise qualified is not an issue properly before this court.  "It is . . . well established that Congress can, within constitutional limits, determine the terms and conditions under which an appropriation may be used."  1 U.S. Gen. Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law (3d ed. 2004), 2004 WL 5661322 ("GAO Redbook"); *id.* ("Congress can decree, either in the appropriation itself or by separate statutory provisions, what will be required to make the appropriation 'legally available' for any expenditure."); *see also State of Okla. v. Schweiker*, 655 F.2d 401, 406 (D.C. Cir. 1981) (noting Congress's broad discretion to set the terms of appropriations and listing cases to that effect).  Congress was accordingly free to define the beneficiary class of the Appropriations Acts as it deemed appropriate.[58]  The government's motion to dismiss this claim is accordingly granted.

4.   *Review of community governing documents.*

In count V of plaintiffs' proposed sixth amended complaint, plaintiffs ask the court to issue an order setting aside provisions in the three communities' constitutions, ordinances, resolutions, censuses, rolls, and tribal revenue allocation plans "which are repugnant to the

---

"tribal recognition remains a political question," *Samish*, 419 F.3d at 1373, and plaintiffs' claims as to the Reorganization Act and the Indian Gaming Act are essentially grounded in the contention that the government erred in approving tribal constitutions and various documents that did not comport with the Acts' restrictions, there is a distinct possibility that plaintiffs' claims would have been nonjusticiable, at least in this court which does not have juridical power under the federal-question jurisdictional statute, 12 U.S.C. § 1331, or the Administrative Procedure Act.

[58]As noted previously, the court's finding that the appropriated funds conceptually served as a substitute for terminated treaty payments does not mean that Congress was in reality legally obligated to appropriate funds to particular persons among the loyal Mdewakanton.

[s]tatutory [u]se [r]estriction[s]" and remanding the matter to the Department of Interior with directions to cause the governing documents to be modified. Sixth Am. Compl. ¶ 116. The government asserts that the court does not have jurisdiction over that claim and, alternatively, that such a claim would be barred by the statute of limitations. Def.'s Opp'n at 17.

For purposes of the Indian Tucker Act, this court's power to order equitable relief is delineated in 28 U.S.C. § 1491(a)(2). That provision states that "[t]o provide an entire remedy and to complete the relief afforded by the [money] judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." Section 1491(a)(2) plainly does not convey the power to afford the equitable relief plaintiffs seek. *See Flowers v. United States*, 80 Fed. Cl. 201, 221-22 (2008), *aff'd*, 321 Fed. Appx. 928 (Fed. Cir. 2008) (noting that 28 U.S.C. § 1491(a)(2) "enables the court to grant equitable relief under limited circumstances"). While "limited equitable relief sometimes is available in Tucker Act suits . . . that equitable relief must be 'an incident of and collateral to' a money judgment." *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (quoting 28 U.S.C. § 1491(a)(2)); *id.* ("Stated another way, the Court of Federal Claims has no power [under Section 1491(a)] to grant affirmative non-monetary relief unless it is tied and subordinate to a money judgment." (internal quotation omitted)). Any money judgment the court issues in this case would not be directly tied to the tribal governing documents plaintiffs seek to set aside; thus, an order requiring their alteration or modification could not be characterized as "an incident of and collateral to" a money judgment. Accordingly, defendant's motion to dismiss as it relates to count V is granted.

5. *Breach-of-trust and breach-of-contract claims.*

Plaintiffs include counts relating to claims of trust mismanagement, breach of contract, the separately-pled claims of minors in the amended complaint, but they note that such claims have been dismissed or otherwise subsumed into count IV. Sixth Am. Compl. ¶¶ 8-10. The breach-of-contract claims and separately pled claims of minors were addressed and rejected in a prior opinion of this court, and the breach-of-trust claims were denied in the Federal Circuit's opinion. *See Wolfchild VI*, 559 F.3d 1255, 1260 (disposing of plaintiffs' trust claims); *Wolfchild I*, 62 Fed. Cl. at 547-49 (dismissing plaintiffs' breach-of-contract claim and the separately-pled claims of minor plaintiffs). Accordingly, the court grants the government's motion to dismiss plaintiffs' count I (trust mismanagement), count II (breach of contract), and count III (separately-pled claims of minor plaintiffs).

6. *Partial summary judgment.*

As the preceding analysis shows, as lineal descendants of the 1886 Mdewakanton, plaintiffs were entitled to the funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act. The Indian Trust Accounting Statute serves to toll the accrual of the statute of limitations as to this claim, and the 1980 Act did not affect plaintiffs' entitlement to the leasing and licensing funds generated and obtained prior to the passage of the 1980 Act. The undisputed facts demonstrate that the government disbursed the funds to the three communities rather than to the lineal descendants, thereby contravening the provisions of the Appropriations Acts that dictated that only eligible Mdewakanton could receive the benefits of the Acts and that

such benefits be conferred in as equal an amount as practicable.  Consequently, the government is liable in damages in the amount of these funds.  Based upon the text of the Acts and the extensive historical record, which was largely uncontroverted by the parties, the court can ascertain "no genuine issue as to any material facts."  RCFC 56(c)(1); *see Matsushita*, 475 U.S. at 586-87.  Nor has the government come forward with specific facts demonstrating a genuine issue for trial.  *See* RCFC 56(e)(2).  Accordingly, plaintiffs' motion for summary judgment as to its entitlement to the funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act is granted.  As explained *supra*, the Wabasha-Land-Transfer funds are excluded from this grant.

## CONCLUSION

For the reasons stated, the court grants in part and denies in part the government's motions to dismiss this action.  The government's motion to dismiss as it relates to plaintiffs' entitlement to the Wabasha-Land-Transfer funds and any revenue derived from the 1886 lands after the passage of the 1980 Act is granted.  The government's motion to dismiss as it relates to plaintiffs' entitlement to funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act is denied.  Accordingly, the court also denies the governments' motion respecting plaintiffs' claim for attorneys' fees.  The court grants in full the government's motion to dismiss plaintiffs' count I (trust mismanagement), count II (breach of contract), count III (separately-pled claims of minor plaintiffs), and count V (community governing documents).

The court grants plaintiffs' cross-motion for partial summary judgment that: (1) with the exception of the Wabasha-Land-Transfer funds, the Secretary was bound to distribute funds derived from leasing and licensing the 1886 lands prior to the passage of the 1980 Act to the lineal descendants of the loyal Mdewakanton, (2) the 1980 Act did not extinguish plaintiffs' claims as to those particular funds, and (3) the Secretary's disbursal of those funds to the three communities in lieu of the lineal descendants as a group entitles plaintiffs to damages in the amount of the distributed funds.  The court otherwise denies the plaintiffs' motion for partial summary judgment.

Plaintiffs' motion for leave to file a Sixth Amended Complaint is granted, and the court will deem that complaint filed as of July 9, 2010, the date on which the court received plaintiffs' motion.  Intervening plaintiffs' motions for leave to file their amended complaints are likewise granted.

The parties are requested to file a joint status report on or before January 19, 2011, addressing a means of, and arrangements for, entering a final judgment in this litigation.  A status conference will be held January 21, 2011 at the National Courts Building in Washington, D.C., commencing at 10:00 a.m., EST.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge